# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAY 0 8 2014

CHIEF JUSTICE



This opinion was filed for record
at 8:00 am on May 8, 2014

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 88437-4 |
| Respondent, | EN BANC |
| v. | |
| JAMES LEROY LINDSAY, SR., | Filed __MAY 0 8 2014__ |
| Petitioner. | |
| STATE OF WASHINGTON, | |
| Respondent, | |
| v. | |
| JENNIFER SARAH HOLMES, | |
| Petitioner. | |

GORDON MCCLOUD, J.—Jennifer Holmes and James Lindsay entered the home of Laurence Wilkey, Holmes's former boyfriend. They tied him up, beat him, and took a number of items from his home. The State charged Holmes and Lindsay

with first degree robbery, burglary, kidnapping, and assault, as well as firearm theft. Holmes and Lindsay argued that they did not intend to commit a felony but were instead repossessing things that Wilkey had originally stolen from Holmes. A jury convicted them on most, but not all, counts.

The trial was plagued by misconduct. The prosecutor and the lawyer for Holmes (but not Lindsay) engaged in unprofessional behavior, trading verbal jabs and snide remarks throughout over 90 volumes of proceedings in this case. On appeal, Holmes and Lindsay argued that the prosecutor's remarks, particularly during closing arguments, constituted misconduct that prejudiced both defendants. The Court of Appeals agreed that the prosecutor committed misconduct but split as to whether that misconduct caused prejudice. *State v. Lindsay*, 171 Wn. App. 808, 288 P.3d 641 (2012) (*Lindsay & Holmes*). Two judges thought it did not; one dissenter thought that it did. Although Holmes and Lindsay submitted several issues to this court in their petitions for review, we accepted review of only the prosecutorial misconduct issue. *State v. Lindsay*, 177 Wn.2d 1023, 303 P.3d 1064 (2013).

We reverse. To be sure, the jury did its best to focus on the facts: it made separate decisions on each of the separate crimes charged against each defendant and it convicted on some, acquitted on some, and convicted of lesser offenses on others. In addition, the trial court attempted to maintain civility. But given the

2

magnitude of the problem and the two lawyers' inability to control their conduct, we agree with the Court of Appeals dissent that reversal is required.

## FACTS

Jennifer Holmes met James Lindsay and decided to marry him. This ended her relationship with Laurence Wilkey, with whom she had been living in Idaho. Wilkey moved out while Holmes and Lindsay were away on a trip together, and he took several things of value with him. When Holmes returned to an empty house, she called the police. After investigating, the police in Idaho advised her that it was a civil matter and that she should get a civil attorney.

Holmes did not follow this advice. Instead, she and Lindsay tracked Wilkey down to his new home in Pierce County. The precise details of their encounter are disputed, and Lindsay, Holmes, and Wilkey all gave significantly different accounts of what happened. Taking the facts in the light most favorable to the State, though, Lindsay and Holmes entered the house; Lindsay and Wilkey scuffled; Wilkey got the worst of it and ended up tied up on the floor. He may have been threatened with a gun and beaten with a pipe after he was tied up. Lindsay and Holmes then took a number of things that they claimed belonged to Holmes and left.

The State charged Lindsay and Holmes with one count each of first degree burglary, first degree robbery, first degree kidnapping, and first degree assault, and four counts each of theft of a firearm. At a joint trial, the jury convicted Lindsay of

first degree burglary, first degree robbery, one of the four counts of firearm theft, and the lesser included crimes of second degree kidnapping and second degree assault. Clerk's Papers (CP) (Lindsay) at 382-89. It also convicted Holmes of first degree burglary, first degree robbery, one of the four counts of firearm theft, and the lesser included crimes of unlawful imprisonment and second degree assault. CP (Holmes) at 708-27.

The record shows that the prosecutor, John Sheeran, and Holmes's defense counsel, Barbara Corey, engaged in unprofessional exchanges throughout the trial. The dissent in the Court of Appeals accurately describes some of those exchanges:[1]

> For example, not only did the prosecutor and Holmes's counsel interrupt each other, they interrupted the trial court, at one point causing the trial court to ask, "Can I finish for once?" 42 [Report of Proceedings (RP)] RP at 3569. Other examples of disrespect to the trial court include the prosecutor telling the trial court that Holmes's counsel's request to interrupt the trial was "a joke" and "ridiculous" and that Holmes's counsel wanted a "Burger King trial . . . [h]ave it my way." 34 RP at 2557. At another point, the prosecutor told the trial court, "I didn't object [earlier] because I was laughing so hard it was so stupid." 53 RP at 4572-73. Later, the prosecutor told Holmes's counsel that she was repeating herself[;] she replied by telling him to "kindly shut up." 51 RP at 4309. The prosecutor then asked the trial court to instruct Holmes's counsel not to repeat herself; Holmes's counsel replied, "Maybe [the prosecutor] could borrow Your Honor's gown and tell us all how to run this trial." 51 RP at 4309.

---

[1] Note that the following exchanges took place outside the presence of the jury; we cite it only as context for the general tenor of the trial. All other statements presented in this opinion are statements that were said in front of the jury, unless otherwise noted.

In another instance, Holmes's counsel told the trial court that the prosecutor's comments were "obnoxious." 44 RP at 3831. In response, the prosecutor said, "This is the same garbage that I was talking about days ago when I lost my temper in this courtroom, because it's what she does." 44 RP at 3833.

*Lindsay & Holmes*, 171 Wn. App. at 850 (Armstrong, J. Pro Tem., dissenting) (most alterations in original).

The record is filled with similar acrimony. The primary source of the misconduct, however—according to the parties and the Court of Appeals—was the prosecutor's closing argument.

In his closing, the prosecutor called the defense's closing argument "a crock." 95 Verbatim Report of Proceedings (VRP) at 8877.

The prosecutor also stated that the defendant Holmes's testimony was "funny," "disgusting," "comical," and "the most ridiculous thing I've ever heard." *Id.* at 8717, 8722, 8708. He told the jury that Holmes should not "get up here and sit here and lie." *Id.* at 8882.

The prosecutor described the beyond a reasonable doubt standard as follows: "[Y]ou put in about 10 more pieces and see this picture . . . . [Y]ou can be halfway done with that puzzle. . . . You could have 50 percent of those puzzle pieces missing and you know it's Seattle." *Id.* at 8727. He also compared it to the amount of certainty one needs to cross the street in a crosswalk. *Id.* at 8728 ("You're walking because beyond a reasonable doubt you're confident you can walk across that

crosswalk without getting run over."). Further, the prosecutor exhorted the jury to "[s]peak the truth." *Id.* at 8730. He asked the jury "only to do what you swore to do: Render verdicts." *Id.* He explained that "verdict" is Latin for "to speak the truth" and that "voir dire" means the same in French. *Id.* Finally, he stated, "You start with one, voir dire, when you started this trial, and you end with one, verdictum, verdict. So I'm just asking you to do what you know is true: Speak the truth. Convict both of these defendants . . . ." *Id.*

Finally, the prosecutor spoke so quietly to the jury on several occasions that the court reporter could not hear him and the judge had to ask him to repeat himself. The prosecutor then made a joke out of this when Holmes's counsel protested by standing behind her and speaking very loudly, to the laughter of the jury.

## ANALYSIS

"Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard." *State v. Brett*, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995) (citing *State v. Hughes*, 106 Wn.2d 176, 195, 721 P.2d 902 (1986)). The defendant bears the burden of showing that the comments were improper and prejudicial. *State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). In the past, our court has also stated that if the defendant fails to object or request a curative instruction at trial, the issue of misconduct is waived unless the conduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *State v. Stenson*,

132 Wn.2d 668, 719, 940 P.2d 1239 (1997).[2] In this case, however, defense counsel made a motion for a mistrial due to prosecutorial misconduct directly following the prosecutor's rebuttal closing argument, citing many of the same examples that are raised on appeal. Thus, the issue was preserved for appellate review. *See United States v. Prantil,* 764 F.2d 548, 555 n.4 (9th Cir. 1985) (mistrial motion following the prosecutor's closing is "an acceptable mechanism by which to preserve challenges to prosecutorial conduct"). The judge ruled that the prosecutor's comments were not improper—thus, curative instructions were not discussed.

The prosecutorial misconduct inquiry therefore consists of two prongs: (1) whether the prosecutor's comments were improper; and (2) if so, whether the improper comments caused prejudice. *Warren,* 165 Wn.2d at 26. We thus begin by analyzing the propriety of the prosecutor's comments.

I.    IMPROPER COMMENTS

The prosecutor made improper statements in this case. Both the Court of Appeals majority and dissent concluded that many of his comments were improper. Even the State, in its supplemental briefing to this court, admits that some of the comments were improper. The State's argument is, essentially, that many of the

---

[2] When applying this standard, we have noted that courts should "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *State v. Emery,* 174 Wn.2d 741, 762, 278 P.3d 653 (2012).

improper comments either were not objected to, or were made in response to goading by Holmes's counsel; and, since those comments were not so flagrant and ill intentioned that an instruction would not have cured any prejudicial effect, those errors are waived. As for the remaining, specifically objected-to, comments where the objection was made in the middle of closing, the State argues that even if improper, they did not affect the outcome of the trial.

a.     Impugning

A prosecutor can certainly argue that the evidence does not support the defense theory. *State v. Russell,* 125 Wn.2d 24, 87, 882 P.2d 747 (1994) (citing *State v. Graham,* 59 Wn. App. 418, 429, 79 P.2d 314 (1990)). However, a prosecutor must not impugn the role or integrity of defense counsel. *Warren,* 165 Wn.2d at 29-30; *State v. Negrete,* 72 Wn. App. 62, 67, 863 P.2d 137 (1993). Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible. *Bruno v. Rushen,* 721 F.2d 1193, 1195 (9th Cir. 1983) (per curiam).

The Court of Appeals found that the prosecutor impugned defense counsel with the following comments: "'[S]he doesn't care if the objection is sustained or not,'" "'We're going to have like a sixth grader [argument],'" and "'[W]e're into silly.'" *Lindsay & Holmes,* 171 Wn. App. at 827 (alterations in original). In addition, the Court of Appeals relied on the following interactions:

8

> Another time, Holmes's counsel was in the middle of an objection and the prosecutor interrupted her saying, "Yeah, we all know that." 87 VRP at 8092. Yet another time, the prosecutor responded to Holmes's counsel's objection by stating, "Maybe if counsel and her client could just be quiet for a few minutes they might be able to hear something." 95 VRP at 8887. At one point, the prosecutor became visibly upset and Holmes's counsel said the prosecutor is having "a tantrum." 52 VRP at 4554. The prosecutor replied, "And counsel walked right into this after freaking six weeks" and said directly to Holmes's counsel, "Tantrum, because you—." 52 VRP at 4554.

*Id.* at 827.

This exchange (and the many more like it) is self-centered and rude. It is all about the lawyers' personalities, not the parties' cases. It is clearly the fault of both lawyers, and it is so obnoxious and so continuous that it permeates the record. In fact, it seems to this court that it would be incredibly difficult to focus on the issue of guilt or innocence with this grating noise in the background. Such incivility threatens the fairness of the trial, not to mention public respect for the courts. *See Jones v. City of Seattle*, 179 Wn.2d 322, 371, 314 P.3d 380 (2013) (González, J., concurring).

These comments quoted immediately above, alone, though, probably do not require reversal. In past cases finding that the prosecutor impugned defense counsel, the prosecutor made more egregious statements than the ones above. In *Negrete*, for example, the prosecutor said that defense counsel was "'being paid to twist the words of the witnesses.'" 72 Wn. App. at 66. In *State v. Gonzales*, the prosecutor

impermissibly contrasted the roles of prosecutor and defense counsel, stating that while the defense attorney's duty was to his criminal client, the prosecutor's duty was "'to see that justice is served.'" 111 Wn. App. 276, 283, 45 P.3d 205 (2002). And in *Bruno*, "the obvious import of the prosecutor's comments was that *all* defense counsel in criminal cases are retained solely to lie and distort the facts and camouflage the truth." 721 F.2d at 1194. Thus, the unprofessional exchanges above, alone, probably did not fundamentally undermine defense counsel's role or integrity. They certainly undermined the authority of the court and the formality of the proceeding, though.

Another statement by the prosecutor, however, did directly impugn defense counsel. The prosecutor stated in closing, in reference to Holmes's counsel's closing argument, "This is a crock. What you've been pitched for the last four hours is a crock." 95 VRP at 8877. In *State v. Thorgerson*, we held that "the prosecutor impugned defense counsel's integrity, particularly in referring to his presentation of his case as 'bogus' and involving 'sleight of hand.'" 172 Wn.2d 438, 451-52, 258 P.3d 43 (2011) (citing *Warren*, 165 Wn.2d at 29). We continued, "In particular, 'sleight of hand' implies wrongful deception or even dishonesty in the context of a court proceeding." *Id.* at 452 (defining "sleight of hand") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2141 (2003)).

The term "crock" is at least as bad. It also implies deception and dishonesty.[3] In addition, the term "a crock" is commonly understood to be a shortening of an explicitly vulgar phrase. Describing a defense counsel's argument with that full phrase would certainly impugn defense counsel's integrity. Calling counsel's argument "a crock" is not much different. Given our discussion of the terms "bogus" and "sleight of hand" in *Thorgerson*, we hold that the prosecutor impugned defense counsel in this case by calling Holmes's counsel's closing arguments "a crock."

b.    Burden of Proof

Arguments by the prosecution that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt constitute misconduct. *State v. Gregory*, 158 Wn.2d 759, 859-60, 147 P.3d 1201 (2006). The Court of Appeals found that the prosecutor misstated the burden of proof by comparing the beyond a reasonable doubt standard to figuring out a jigsaw puzzle and crossing the street, and by telling the jury to speak the truth.

*i. Jigsaw Puzzles*

Regarding puzzles, the prosecutor stated:

---

[3]    *See, e.g., Crock*, DICTIONARY.COM, http://dictionary.reference.com/browse/crock?s=t (last visited Mar. 28, 2014) (defining "crock" in part as "a lie; exaggeration; nonsense").

> [O]ne of the simplest [ways to explain reasonable doubt] is the idea of a jigsaw puzzle. . . . [T]he first thing you do is you get all the pieces that have edges on them, start to lock them together, you're trying to get the outline. . . . [Y]ou put a few more pieces in . . . and you start to get a better idea of what that picture is. . . . And then you put in about 10 more pieces and see this picture of the Space Needle. Now, you can be halfway done with that puzzle and you know beyond a reasonable doubt that it's Seattle. You could have 50 percent of those puzzle pieces missing and you know it's Seattle.

95 VRP at 8726-27.

Several cases from the Court of Appeals have examined whether puzzle analogies are improper.

In *State v. Johnson*, a Division Two case, the prosecutor made an argument nearly identical to the one above, stating, "'You add a third piece of the puzzle, and at this point even being able to see only half, you can be assured beyond a reasonable doubt that this is going to be a picture of Tacoma.'" 158 Wn. App. 677, 682, 243 P.3d 936 (2010). The court held that "the prosecutor's arguments discussing the reasonable doubt standard in the context of making an affirmative decision based on a partially completed puzzle trivialized the State's burden, focused on the degree of certainty the jurors needed to act, and implied that the jury had a duty to convict without a reason not to do so." *Id.* at 685. The court reversed the conviction, stating that "a misstatement about the law and the presumption of innocence due a defendant, the 'bedrock upon which [our] criminal justice system stands,' constitutes great prejudice because it reduces the State's burden and undermines a defendant's

12

due process rights." *Id.* at 685-86 (quoting *State v. Bennett,* 161 Wn.2d 303, 315, 165 P.3d 1241 (2007)).

In *State v. Curtiss,* Division Two reached a different conclusion regarding a similar jigsaw puzzle argument. 161 Wn. App. 673, 250 P.3d 496 (2011). There, the prosecutor stated, "'There will come a time when you're putting that puzzle together, and even with pieces missing, you'll be able to say, with some certainty, beyond a reasonable doubt what that puzzle is: The Tacoma Dome.'" *Id.* at 700. The court did not mention *Johnson* but held that the State's comments about identifying a puzzle before it was complete were not improper. *Id.* at 700-01.

In *State v. Fuller,* Division Two explained the difference between *Johnson* and *Curtiss.* 169 Wn. App. 797, 282 P.3d 126 (2012), *review denied,* 176 Wn.2d 1006, 297 P.3d 68 (2013). The *Fuller* court explained that the quantification by the prosecutor of the number of pieces and percentage of completion required for reasonable doubt in *Johnson* was entirely different from the prosecutor's general reference to being able to discern the subject of a puzzle with some pieces missing in *Curtiss. Id.* at 825-28. The former statement introduced elements of specific quantification into the reasonable doubt analysis, while the latter did not. *Id.*

This case is plainly analogous to *Johnson,* not *Curtiss.* The prosecutor stated that "you put in about 10 more pieces and see this picture of the Space Needle. Now, you can be halfway done with that puzzle and you know beyond a reasonable doubt

13

that it's Seattle. You could have 50 percent of those puzzle pieces missing and you know it's Seattle." 95 VRP at 8727. That is almost identical to the comments held prejudicial misconduct in *Johnson*. It is not analogous to the comments in *Curtiss* or *Fuller*, which made no reference to any number or percentage and merely suggested that one could be certain of the picture beyond a reasonable doubt even with some pieces missing. We agree that the quantifying of the standard of proof by means of this jigsaw puzzle analogy is improper.

### ii. Crosswalks

In explaining reasonable doubt in his closing, the prosecutor told a narrative about approaching a crosswalk and seeing a car coming:

> He has the red light, you've got a walk sign, you look at him, he sees you, he's slowing down, he nods and you start walking. You're walking because beyond a reasonable doubt you're confident you can walk across that crosswalk without getting run over.

*Id.* at 8728. As the Court of Appeals points out, "When a prosecutor compares the reasonable doubt standard to everyday decision making, it improperly minimizes and trivializes the gravity of the standard and the jury's role." *Lindsay & Holmes*, 171 Wn. App. at 828 (citing *State v. Anderson*, 153 Wn. App. 417, 431, 220 P.3d 1273 (2009)). We agree with the Court of Appeals that this kind of analogy to everyday experiences trivializes the State's burden of proof and is improper.

### iii. Speaking the Truth

The Court of Appeals held that telling the jury to "find the truth" or "speak the truth" is improper. That court had previously held such statements trivialized the burden of proof in *Anderson*: "The prosecutor's repeated requests that the jury 'declare the truth,' however, were improper. A jury's job is not to 'solve' a case. . . . Rather, the jury's duty is to determine whether the State has proved its allegations against a defendant beyond a reasonable doubt." 153 Wn. App. at 429.

There is some conflict in Division Two cases about whether an exhortation to the jury to "speak the truth" is improper. In *Anderson*, the court held that it was improper. In *Curtiss*, the court held that it was not. Later, in *State v. Walker*, Division Two implicitly rejected *Curtiss* on this point. 164 Wn. App. 724, 733, 265 P.3d 191 (2011) ("We rely on *Anderson* [as opposed to *Curtiss*] in our determination the statements in the present case are improper conduct.").

The Court of Appeals agreed that the statements in this case were misconduct under *Walker*. The statements in *Walker* are nearly identical to the statements at issue here. *Walker*, 164 Wn. App. at 732-33 ("'The word "verdict" comes from a Latin word, "veredictum." Veredictum means to declare the truth. And so by your verdict in this case, you folks, the 12 of you who will deliberate, will decide the truth of what happened . . . .'").

We agree. Telling the jury that its job is to "speak the truth," or some variation thereof, misstates the burden of proof and is improper.

c.     Expression of Personal Opinion of Credibility/Guilt

It is impermissible for a prosecutor to express a personal opinion as to the credibility of a witness or the guilt of a defendant. *State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984) (citing AM. BAR ASS'N, MODEL CODE OF PROFESSIONAL RESPONSIBILITY AND CODE OF JUDICIAL CONDUCT § DR 7-106(C)(4) (1980)). It constitutes misconduct, *id.,* and violates the advocate-witness rule, which "prohibits an attorney from appearing as both a witness and an advocate in the same litigation." *Prantil,* 764 F.2d at 552-53.

The prosecutor told the jury in his closing that the defendant Holmes's testimony was "funny" and "disgusting," 95 VRP at 8717, "comical," *id.* at 8722, and "the most ridiculous thing I've ever heard," *id.* at 8708. The Court of Appeals noted that words like "ridiculous" or "preposterous" in relation to testimony are not, alone, an improper expression of personal opinion as long as the prosecutor is arguably drawing an inference from the evidence. *Anderson,* 153 Wn. App. at 430. The Court of Appeals also noted, though, that the prosecutor told the jury that Holmes should not "get up here and sit here and lie." 95 VRP at 8882. And the Court of Appeals was particularly disturbed by the prosecutor's reference to Holmes's theory of the case as "a crock," which it held was plainly an expression of personal opinion as to credibility. *Lindsay & Holmes,* 171 Wn. App. at 833.

The prosecutor's "crock" comment was a comment on both defense counsel's closing argument and the defendant Holmes's testimony, because the two are to some degree inseparable. The prosecutor's argument that Holmes lied on the stand and the statement that Holmes's testimony was "the most ridiculous thing I've ever heard" are even more direct statements of the prosecutor's personal opinion as to Holmes's veracity. 95 VRP at 8722. An isolated use of the term "ridiculous" to describe a witness's testimony is not improper in every circumstance. But labeling testimony "the most ridiculous thing *I've ever heard*" is an obvious expression of personal opinion as to credibility. There is no other reasonable interpretation of the phrase. Given that comment, in context with the "crock" accusation and the "sit here and lie" argument, we hold that the prosecutor in this case impermissibly expressed his personal opinion about the defendant's credibility to the jury.

> d.    Inaudible statements to jury

The prosecutor during closing arguments spoke to the jury so softly that the court reporter, parties, and their attorneys could not hear him. The prosecutor's voice became inaudible three times. The first time, the record states, "Do they get . . . (sotto voce.)" 95 VRP at 8884 (alteration in original). After the court reporter and defendants' lawyers said they could not hear the prosecutor, the judge stated, "Keep your voice up, please, so everybody can hear." *Id.* at 8885. The second time, the record states, "I mean, the Jennifer Holmes story is arguably -- well, it's silly . .

17

. (sotto voce.)" *Id.* at 8886 (alteration in original). Defense counsel complained, and the judge asked the reporter to "read that back." *Id.* The reporter said, "I did not hear it, Judge," and the judge replied, "Okay." *Id.* Another debate between counsel ensued, and the prosecutor eventually continued his closing without a further remark from the judge. The third time, the record states, "Ask yourself who wants to find the truth and . . . (sotto voce.)" *Id.* at 8888. The reporter responded, "Ask yourself . . ?" *Id.* (alteration in original). The prosecutor answered, "Who wants to find the truth. Ask yourself what the truth is. Convict them." *Id.* No other comment was made on this third incident. During one of these incidents, the prosecutor, after being told no one could hear him, stood directly behind Holmes's counsel and shouted his next sentence very loudly, to the laughter of the jury. Finally, in a later motion for mistrial based in part on the prosecutor's whispering, the judge stated in denying the motion, "I did tell [the prosecutor] to speak up and he did speak up, and I thought he repeated everything that he said in a voice that everybody could hear, and I think that's what he said on the record." 97 VRP at 8993.

The Court of Appeals did not expressly label this misconduct. It held that although "a prosecutor must never whisper to the jury off the record," the record in this case was "sufficiently complete" to permit review. *Lindsay & Holmes*, 171 Wn. App. at 836.

The dissent disagreed. It asserted this whispering amounted to a private communication with the jury, which is presumed prejudicial, thus shifting the burden to the State to prove the communication was harmless. *Id.* at 851-52 (Armstrong, J. Pro Tem., dissenting) (citing *Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954); *State v. Kell*, 101 Wn. App. 619, 621, 5 P.3d 47 (2000); *State v. Murphy*, 44 Wn. App. 290, 296, 721 P.2d 30 (1986)). Without knowing what the prosecutor said to the jury, the dissent argued, prejudice must be presumed and the State has not rebutted that presumption.

In this case, however, the judge stated, in denying a defense motion for mistrial based on the whispering, "I did tell [the prosecutor] to speak up and he did speak up, and I thought he repeated everything that he said in a voice that everybody could hear, and I think that's what he said on the record." 97 VRP at 8993. Under the circumstances, we find the prosecutor's whispering, although improper, was not presumptively prejudicial. We emphasize, however, that the prosecutor's behavior in both whispering and shouting, as revealed through transcripts and affidavits, was highly unprofessional and potentially damaging to the fairness of the proceedings.

II.    PREJUDICE

a.    The Standard for Determining Prejudice

A claim of prosecutorial misconduct requires the defendant to show both that the prosecutor made improper statements and that those statements caused prejudice.

19

To show prejudice, the petitioners must show a substantial likelihood that the prosecutor's statements affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012) (citing *Anderson*, 153 Wn. App. at 427).

The State argues that if the petitioners failed to object to a particular statement by the prosecutor, they must also show that a jury instruction would not have cured the potential prejudice. *Id.* at 761.[4] The State points out that the following statements did not draw immediate objections: calling Holmes's testimony "funny," "disgusting," and "comical"; the use of the jigsaw puzzle analogy and crosswalk analogy to explain reasonable doubt and the exhortation to the jury to "speak the truth"; and the "crock" and "sit here and lie" comments. However, directly after the prosecutor's closing argument, Holmes's counsel made a motion for mistrial. In that motion she identified a number of the prosecutor's statements as improper for the reasons noted above, stating specifically that "he made his personal opinions about the evidence [known] on numerous occasions," 95 VRP at 8890, and that "he is disparaging counsel, just, you know, egregiously," *id.* at 8891. The Ninth Circuit has recognized that a defense counsel entering "objections to the language and tenor

---

[4] We have often stated this standard as incorporating not only that objective inquiry but also an arguably subjective inquiry; that is, whether "the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61 (citing *Stenson*, 132 Wn.2d at 727). We clarified, though, that "[r]eviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id.* at 762.

of the prosecutor's closing remarks by way of a mistrial motion after the government finished its summation" is "an acceptable mechanism by which to preserve challenges to prosecutorial conduct in a closing argument in lieu of repeated interruptions to the closing arguments," and therefore that the ordinary standard for examining prejudice applies. *Prantil,* 764 F.2d at 555 n.4 (citing *United States v. Lyman,* 592 F.2d 496, 499 (9th Cir. 1979)). The rule in *Prantil* advances the policy reasons for the contemporaneous objection rule, such as giving the trial court a chance to correct the problem with a curative instruction, and we therefore adopt it. Under this rule, the defense certainly preserved the issue for review.

> b.     Application of the Standard

The State argues that Holmes's counsel baited the prosecutor into misconduct, and so his improper statements cannot be grounds for reversal. It is true that improper comments by the prosecutor might not be grounds for reversal if they were specifically provoked by defense counsel. *State v. Weber,* 159 Wn.2d 252, 276–77, 149 P.3d 646 (2006).

That is not what happened in this case, though. Most of the improper arguments in this case occurred during the prosecutor's closing. They are not directly preceded by any statements from defense counsel to which the prosecutor was responding. Moreover, in this context, the prosecutor is held to a higher standard than defense counsel. *E.g., State v. Monday,* 171 Wn.2d 667, 676, 257 P.3d

21

551 (2011) ("The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated." (citing *State v. Case*, 49 Wn.2d 66, 71, 298 P.2d 500 (1956))). We reject the State's argument that the prosecutor's behavior in this case is excused because Holmes's counsel also acted unprofessionally.

The State also argues that defense counsel failed to object to many of the statements in the prosecutor's closing argument, so the defendants have waived any claim of prejudice relating to those statements. But, as explained above, Holmes's defense counsel made a motion for mistrial directly following the prosecutor's closing argument objecting to "the language and tenor of the prosecutor's closing remarks." *Prantil*, 764 F.2d at 555 n.4. Thus, her motion was sufficient to preserve review under the ordinary prejudice standard.

The State's argument also disregards the context of the trial. The many examples of misconduct in this case "demonstrate more than the prosecutor's and Holmes's counsel's treatment of each other; they show an unthinkable disrespect for the trial court and the whole trial process." *Lindsay & Holmes*, 171 Wn. App. at 851 (Armstrong, J. Pro Tem., dissenting). Such disrespect for the process infects the entire trial. *See Jones*, 179 Wn.2d at 371 (González, J., concurring). Under the circumstances, there is a substantial likelihood that the prosecutor's calling the defense's closing arguments "a crock," telling the jury that defendant Holmes should

not "lie," and labeling her testimony "the most ridiculous thing I've ever heard" influenced the jury's verdict.

Even under the more stringent standard for determining prejudice, the results would be the same. In *In re Personal Restraint of Glasmann*, despite the defendant's failure to object, "the misconduct . . . was so pervasive that it could not have been cured by an instruction." 175 Wn.2d 696, 707, 286 P.3d 673 (2012). Here, as in *Glasmann*, "'[T]he cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect.'" *Id.* (alteration in original) (quoting *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011)). Moreover, federal courts have held that comments at the end of a prosecutor's rebuttal closing are more likely to cause prejudice. *E.g.*, *United States v. Sanchez*, 659 F.3d 1252, 1259 (9th Cir. 2011) (significant that prosecutor made improper statement "at the end of his closing rebuttal argument, after which the jury commenced its deliberations"); *United States v. Carter*, 236 F.3d 777, 788 (6th Cir. 2001) (significant that "prosecutor's improper comments occurred during his rebuttal argument and therefore were the last words from an attorney that were heard by the jury before deliberations"). Here, the prosecutor made several of his improper comments, including the "crock" and "sit here and lie" statements, during his rebuttal closing, increasing their prejudicial effect.

23

We recognize that the jury in this case took care to parse the competing narratives presented by the parties and to render considered verdicts on each of the many counts. It convicted on only some of the charges and returned several lesser included offense convictions. We also recognize that the judge attempted to curb the two lawyers' incivility, even, at one point, threatening sanctions. We nevertheless find the fairness of the trial, which turned largely on credibility, was tainted by (1) the pervasive misconduct of the prosecutor and (2) the unprofessionalism displayed by both the prosecutor and Holmes's attorney throughout the proceedings. We reverse the Court of Appeals because of both problems, reverse the defendants' convictions, and remand this case for a new trial.

## CONCLUSION

The prosecutor and defense counsel for one of the defendants in this case behaved unprofessionally and disrespectfully towards each other, towards the defendants, and towards the court throughout the trial. That disrespect permeated the trial process. Against that background, the prosecutor, in his closing arguments, denigrated defense counsel, misstated the burden of proof, expressed his personal belief as to one defendant's veracity, and whispered to the jury so that no one else in the courtroom could hear him. There is a substantial likelihood that those actions, in context, affected the jury's verdict. Given the defendant's immediate postargument motion for mistrial, there is no need to decide whether a curative

instruction could have cured the prejudice. But even under that more stringent standard, the defendants have demonstrated a likelihood of prejudice in this case. We reverse the Court of Appeals and remand the case for a new trial.

Gordon McCloud, J.

WE CONCUR:

Madsen, C.J.

J.M. Johnson, J.P.T.

C. Johnson, J.

Stephens, J.

Owens, J.

Wiggins, J.

Fairhurst, J.

González, J.