IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 74255-8-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| HEYENG CHENG, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 20, 2017 |
| | ) | |

LEACH, J. — Heyeng Cheng appeals his conviction for second degree malicious mischief. He primarily challenges the trial court's admission of a 911 call in which his partner requested help after he made death threats against her. He also challenges the pattern jury instruction on reasonable doubt and claims the State committed prosecutorial misconduct in its closing argument. Finally, he challenges the constitutionality of the mandatory deoxyribonucleic acid (DNA) collection fee and victim penalty assessment as applied to him. We reject each of these arguments.

Because the 911 caller's statements had the primary purpose of meeting an emergency, those statements were not testimonial and the Sixth Amendment did not bar their admission. This court has repeatedly rejected Cheng's arguments against the pattern reasonable doubt instruction and the mandatory

fees. And the prosecutor's explanation of circumstantial evidence in closing was not improper. Thus, we affirm Cheng's conviction.

FACTS

In December 2014, Kira Dempsey and her two sons were living with her mother, Leslie Dempsey, in Lake Forest Park.[1] Kira was in a romantic relationship with Heyeng Cheng. Cheng stayed with the Dempseys the night of December 29, as he often did. He was sick that night but wanted to borrow Kira's car. Kira refused. After she told Cheng he was too sick to drive, Cheng threatened to damage the car with a baseball bat. He eventually fell asleep.

Cheng was still sleeping when Kira and Leslie left for work the next morning. When Leslie returned that afternoon, Kira's car and Cheng were gone. Cheng's car was still in the driveway. Inside, the house was a "mess," with "[t]hings overturned and broken." A bathroom door had been torn from its hinges and smashed on an overturned chair in the living room. Broken glass covered the living room carpet, the dining table was taken apart, the television was broken, and there were holes in the wall. In Kira's bedroom, the wooden dresser was in pieces, her clothes strewn around, and her mattress overturned. Her son's crib was broken.[2]

---

[1] To avoid confusion, we refer to Kira and Leslie Dempsey by their first names.

[2] In all, the damage cost over $3,000 to repair.

Leslie called Kira, who came home from work. She then called the police. Kira, Leslie, and the two children spent the night in a hotel. Leslie later testified that Kira spoke with Cheng on the way to the hotel and that Cheng called Kira several times that night. Leslie said that when Kira spoke with Cheng on speaker phone in the car, he sounded agitated and angry. She testified that Cheng "made a threat to my daughter and the grandsons" that "he would hire a drug fiend and have them killed or . . . put a hit on them."

When the family got to the hotel, Kira called 911. She explained she "was working with Officer Parrish earlier on a case of . . . DV [domestic violence] mischief" and that the person who had vandalized her house and taken her car had just called.[3] She said that Cheng threatened to damage her car and to hire a "dope fiend" to "put a hit" on her and her children if she had him arrested. She told the dispatcher that she was "really scared" that Cheng would kill her and that she was staying at a hotel "because of all the damage he did to our house earlier." The dispatcher asked if Kira wanted to speak to an officer, and she said yes. She repeated that she was scared. The dispatcher told Kira she would have an on-duty officer call her back.

The police arrested Cheng the next day. During multiple calls from jail, Cheng told Kira that she was a "snitch," that "[t]his s*** wouldn't a happened" if

_____

[3] The State played the 911 call for the jury and provided the transcript as a listening aid.

-3-

she had let him go home when he was sick,[4] and that he would "fix all the f***in' furniture"—though he denied breaking any, suggesting at one point that someone else broke it. Kira responded, "[Y]ou called me and told me." Cheng said, "B****, I didn't tell you s***." The two continued to discuss the damage to Leslie's house, with Cheng saying he would pay for the damage. Cheng said he would not "do s*** like this" unless he was sick. He blamed Kira for making him stay in the house.

The State charged Cheng with telephone harassment and malicious mischief.[5] The State subpoenaed Kira, but she did not testify. The court determined that her 911 call contained nontestimonial statements and allowed the State to play it for the jury.

In closing argument, the prosecutor explained the State's burden of proving elements of the crime beyond a reasonable doubt. When discussing the mental state elements of the charges, she used defensive driving to illustrate how jurors regularly infer another person's mental state using available circumstantial evidence. The court overruled Cheng's objection.

---

[4] The State also played the jail calls for the jury and provided a transcript as a listening aid.

[5] The State charged both telephone harassment and malicious mischief as domestic violence crimes. RCW 10.99.020. The harassment charge also included a sight-or-sound-of-minor-children aggravator. RCW 9.94A.535(3)(h)(ii).

Cheng's counsel did not propose jury instructions, saying the State's proposed instructions "look[ed] good." The court's jury instruction about the State's burden of proof included the statement that "[a] reasonable doubt is one for which a reason exists."[6]

The jury convicted Cheng of malicious mischief and acquitted him of telephone harassment. The trial court waived all nonmandatory legal financial obligations but imposed two mandatory fees: a $500 victim penalty assessment and a $100 DNA collection fee.[7]

Cheng appeals his conviction and sentence.[8]

## ANALYSIS

### 911 Call

Cheng first contends that the trial court violated his right to confront witnesses when it admitted the tape of Kira's 911 call. We disagree.

The Sixth Amendment bars admission of testimonial statements from nontestifying witnesses unless the defendant had an earlier opportunity to cross-

---

[6] Former 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 85 (3d ed. 2008) (WPIC 4.01).

[7] See RCW 7.68.035; RCW 43.43.7541. The trial court imposed the high end of the sentencing range based on Cheng's offender score and history of "terrorizing the women in [his] life." It also ordered $3,308.14 in restitution to Farmers Insurance and $250.00 in restitution to Leslie.

[8] The trial court allowed Cheng to appeal in forma pauperis based on his declaration that he lacked assets, income, or financial interest in any real or personal property.

examine them.[9] It does not bar nontestimonial statements. We review alleged violations of the confrontation clause de novo.[10]

Whether a statement is testimonial depends on its "'primary purpose.'"[11] The statement is nontestimonial if the witness makes it "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."[12] This can include threats to the victim, police, or the public at large.[13] In contrast, a statement is testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'"[14]

This inquiry is "highly context-dependent."[15] The trial court must objectively evaluate the circumstances as well as the statements and actions of the parties.[16] Washington courts use the following four factors to determine whether a statement had the "primary purpose" of enabling assistance to meet an ongoing emergency: (1) if the speaker was speaking about past events or current ones, as they occurred, requiring police assistance; (2) if a reasonable

---

[9] U.S. CONST. amend. VI; Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

[10] State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009).

[11] Koslowski, 166 Wn.2d at 418 (quoting Davis, 547 U.S. at 822).

[12] Davis, 547 U.S. at 822.

[13] Michigan v. Bryant, 562 U.S. 344, 363, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011).

[14] Davis, 547 U.S. at 822.

[15] Bryant, 562 U.S. at 363.

[16] Bryant, 562 U.S. at 370.

listener would conclude that the speaker was facing an ongoing emergency that required help; (3) the nature of the questions asked and answered; and (4) the interrogation's formality.[17] Washington courts apply these factors to 911 calls. In general, "an emergency 911 call is not of the same nature as an in-custody interrogation by police," but the call still "must be scrutinized to determine whether it is a call for help to be rescued from peril or is generated by a desire to bear witness."[18]

In a domestic violence case, courts assess the presence of an emergency by asking whether the victim faced a continuing threat.[19] Statements can also be nontestimonial in "other circumstances, aside from ongoing emergencies," so long as they were "not procured with a primary purpose of creating an out-of-court substitute for trial testimony."[20]

Here, the parties do not dispute Kira's unavailability to testify or Cheng's lack of an earlier opportunity to cross-examine her. The central issue, then, is whether the admitted statements were testimonial. We conclude that they were not because the four State v. Koslowski[21] factors show that the conversation had the primary purpose of enabling police to meet an ongoing emergency.

---

[17] Koslowski, 166 Wn.2d at 418-19.
[18] State v. Davis, 154 Wn.2d 291, 301, 111 P.3d 844 (2005), aff'd, 547 U.S. at 834.
[19] See Bryant, 562 U.S. at 363-64.
[20] Bryant, 562 U.S. at 358 (emphasis omitted).
[21] 166 Wn.2d 409, 418-19, 209 P.3d 479 (2009).

First, Kira made the call soon after Cheng threatened her and her sons. Courts consider statements made within minutes of an event to be "contemporaneous."[22] A speaker may talk contemporaneously about past events by connecting those events with ongoing ones.[23] Kira spoke contemporaneously here: Cheng threatened Kira and her sons when she talked to him in the car on the way to the hotel. When Kira hung up, she had almost arrived. She called 911 when she got to her hotel room. Although the record does not tell the amount of time between the call with Cheng and the 911 call, the trial court could infer it was a short time. In the call, Kira implied that she had just spoken with Cheng, and she described the threats in the present tense.[24] She connected those threats with her ongoing concern for her safety.[25] The call's timing thus favors finding the statements nontestimonial.

Second, the nature of the operator's questions and Kira's answers indicates that the conversation's main purpose was to meet an emergency, not gather facts for prosecution.

Kira and the operator had this exchange:

OPERATOR:    He's called back since you've spoken to the police earlier?

---

[22] State v. Ohlson, 162 Wn.2d 1, 17, 168 P.3d 1273 (2007).
[23] Koslowski, 166 Wn.2d at 422 n.8.
[24] Kira told the operator, "I've just talked to the person" and "[h]e just called back, and he keeps talking."
[25] See Koslowski, 166 Wn.2d at 422 n.8.

KIRA DEMPSEY: Yes. He just called back, and he keeps talking. I put him on speaker phone in front of mom, talking about all this damage that he's gonna do to the car before I get it back, if I even get it back.

OPERATOR: Does he know where you're at?

KIRA DEMPSEY: No. I would not tell him.

OPERATOR: That's good. Okay.

KIRA DEMPSEY: I'm like scared that he's gonna like kill me actually.

OPERATOR: Okay. As long as he doesn't know where you're at right now.

KIRA DEMPSEY: But he threatened me and my children.

Contrary to Cheng's assertion, the conversation does not show Kira "reporting" what happened in the past. She described Cheng as "the person . . . that did all the vandalism" but offered no details. And the operator did not ask for any. Instead, every question and answer had the evident purpose of establishing whether Kira and her family were safe or needed help. Like the officer in State v. Reed,[26] the operator here focused on learning the victim's location. Then the operator asked whether Kira wanted to speak to an officer. The operator then asked about Cheng, apparently to determine if he was an immediate threat: "Does he know where you're at? . . . As long as he doesn't

---

[26] 168 Wn. App. 553, 566-67, 278 P.3d 203 (2012).

know where you're at right now." In response, Kira repeatedly expressed her fears, even when the operator pointed out that Cheng did not know where she was.

Kira did not offer and the operator did not elicit details indicating an intent to establish facts for later prosecution. The nature of the conversation thus shows that its main purpose was to meet an ongoing emergency. The operator's decision to have an "officer[ ] that is working right now" return Kira's call, rather than the officer she had spoken with earlier, further shows this purpose.

Kira's statement at the beginning of the call that she was already working with an officer on a "DV mischief" case does not change this conclusion. Kira did not ask to speak with that officer. Providing that information was at least as consistent with a desire to quickly get help as it is with a desire to provide information for prosecution. The third factor thus points toward the call being nontestimonial.

Third, like most 911 calls, the call was informal.[27] Like the conversation in Reed, Kira's call was from a location outside police protection and the "calm and structured setting of the station house."[28] Kira's obvious fear for her safety also gave the call an informal tone.

---

[27] See Davis, 547 U.S. at 827 (contrasting the solemnity of a formal police interrogation with franticness of victim's 911 call).
[28] Reed, 168 Wn. App. at 569.

Finally, the "reasonable listener" factor is, at best, neutral for Cheng. Courts have found that a reasonable listener would conclude the declarant faced an ongoing emergency where the declarant faced a "bona fide" or "imminent physical threat." For example, the declarant in Davis v. Washington[29] was being assaulted by her partner when she made her statements. In Reed, the victim was alone and injured, the defendant was at large, and the operator knew the defendant was "highly mobile" and could return at any time.[30] In contrast, where a declarant had been robbed but had no "reason to think that she faced any further threat," the Koslowski court found that she faced no "bona fide physical threat."[31] Similarly, in Hammon v. Indiana (the companion case decided in Davis), the Court found the declarant was not facing an ongoing emergency when she signed an affidavit shortly after her husband battered her. The Court noted that the police were present, the declarant said "things were fine," and the couple was physically separated in different parts of the house.[32]

In some circumstances, an assailant can be absent and still pose a threat. For example, in State v. Ohlson,[33] the declarant made the statements within minutes of the alleged assault. After the defendant attempted to hit a group of

---

[29] 547 U.S. 813, 827, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).
[30] Reed, 168 Wn. App. at 568.
[31] Koslowski, 166 Wn.2d at 423-25.
[32] Davis, 547 U.S. at 819-21, 829-30.
[33] 162 Wn.2d 1, 17, 168 P.3d 1273 (2007); see Reed, 168 Wn. App. at 566-67.

juveniles with his vehicle, he returned and escalated his behavior. Neither the police nor the declarant knew whether the defendant would return again.[34]

Cheng's case does not fit neatly with any of these cases. Like the defendant in <u>Reed</u>, Cheng was at large and mobile when Kira made the 911 call. Unlike the victim in <u>Koslowski</u>, Kira had "reason to think that she faced [a] further threat."[35] And unlike the victim in <u>Hammon</u>, Kira was not protected by the police when she made her statements. And although no evidence shows that Cheng knew where Kira was when she made the 911 call, he knew where Kira and her family lived and likely knew where Kira worked and where the children went to daycare.

In sum, three <u>Koslowski</u> factors strongly indicate that Kira's 911 call was nontestimonial, and the fourth is neutral. On balance, then, the factors show that the call's primary purpose was to meet an ongoing emergency.[36] The trial court properly admitted the call.

Because Kira's out-of-court statements were nontestimonial, we need not decide whether evidence of their content prejudiced Cheng. But if the statements were testimonial, their admission was harmless error. The jury acquitted Cheng of telephone harassment. The State presented the 911 call to

---

[34] <u>Ohlson</u>, 162 Wn.2d at 18.
[35] See <u>Koslowski</u>, 166 Wn.2d at 423-25.
[36] See <u>Davis</u>, 547 U.S. at 822.

prove this crime. Kira's few statements about malicious mischief were mostly cumulative of testimony from Officer Parrish and Leslie. And the State presented overwhelming, untainted evidence that Cheng caused the damage[37] and that he acted knowingly and maliciously.[38] We view as speculative Cheng's argument that the jury may have considered his statements evidence of a propensity to commit crimes. The trial court instructed the jury to decide each count separately, and we presume jurors "follow instructions absent evidence to the contrary."[39]

<u>Reasonable Doubt Jury Instruction</u>

Next, Cheng challenges the trial court's reasonable doubt instruction.

The trial court instructed the jury using the Washington pattern jury instruction on reasonable doubt, WPIC 4.01, stating in part,

---

[37] Cheng introduced no evidence to make plausible the theory he promotes that someone named "Mary" caused the damage.

[38] The jury heard Leslie testify that she heard Cheng threaten Kira and her sons by "hir[ing] a drug fiend and hav[ing] them killed or . . . put a hit on them," and that "you could tell he was angry." The jury also saw pictures of the wreckage done to every room in the house, including damage to Kira's son's crib. (The trial court instructed the jury that the act itself can demonstrate malice when "done in willful disregard of the rights of another.") And the jury heard Cheng's abusive tone in his calls from jail. To the extent that Cheng asked the jury to find that he could not form the required mental state because he was too sick or under the influence of drugs or alcohol, the 911 call did not prevent him from asserting that theory.

[39] State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013).

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

Cheng did not object.

Cheng now claims that defining a reasonable doubt as "one for which a reason exists" erroneously tells jurors that they must be able to articulate a reason for any doubt. He asserts that the instruction thus mirrors the fill-in-the-blank arguments that Washington courts have invalidated as improperly shifting the burden of proof to the defendant.

Following multiple published opinions of this court, we reject Cheng's argument.

Cheng claims an error of constitutional magnitude. For this court to decide to review it under RAP 2.5(a), Cheng must also show the error was "manifest." This "requires a showing of actual prejudice," meaning "'the asserted error had practical and identifiable consequences in the trial.'"[40]

This court recently held, in response to an identical challenge in State v. Hood,

> [T]he error he alleges was not manifest, i.e., it was not an obvious error that the trial court would be expected to correct even without

---

[40] State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007) (internal quotation marks omitted) (quoting State v. WWJ Corp., 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)).

an objection. Our Supreme Court has instructed trial courts to use only the pattern instruction. The trial court was not obligated to anticipate that the use of WPIC 4.01 would be challenged on appeal as undermining the presumption of innocence.[41]

So we decline to review Cheng's challenge. He did not object to the instruction at trial and cannot show that giving the instruction was manifest error. Thus, we need not address the State's assertion that Cheng invited any error by approving the jury instructions.

Closing Argument

Next, Cheng challenges remarks in the prosecutor's closing argument that Cheng contends lowered the State's burden of proof. We disagree.

This court reviews claims of prosecutorial misconduct for abuse of discretion.[42] A prosecutor owes a duty to defendants to ensure that their right to a constitutionally fair trial is not violated.[43] A defendant "bears the burden of proving that the prosecutor's conduct was both improper and prejudicial."[44] Here, Cheng failed to show that the prosecutor's argument was either.

This court evaluates a challenged statement's propriety in "the context of the prosecutor's entire argument, the issues in the case, the evidence discussed

---

[41] State v. Hood, 196 Wn. App. 127, 135-36, 382 P.3d 710 (2016) (citing State v. O'Hara, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009); State v. Bennett, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007)), review denied, No. 93888-1 (Wash. Mar. 8, 2017).
[42] State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014).
[43] State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011).
[44] State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).

in the argument, and the jury instructions."[45]  A prosecutor commits misconduct by shifting or misstating the State's burden to prove guilt beyond a reasonable doubt.[46]  Describing reasonable doubt using an "analogy to everyday experiences trivializes the State's burden of proof and is improper."[47]  Improper analogies include comparing the reasonable doubt threshold to completing more than 50 percent of a jigsaw puzzle or deciding to cross the street when a car is slowing down.[48]

Here, the prosecutor referred to the State's burden of proof multiple times in closing.  She stated that "[p]roof beyond a reasonable doubt is a fundamentally important standard" and the "linchpin of our judicial system."  She noted that while the jury might have "doubts about anything," "unless those doubts raise a question as to the elements of the crime, they do not control your ability to convict."

The prosecutor then discussed the elements of telephone harassment, telling the jury she would focus on Cheng's intent to harass, intimidate, or torment Kira.  She conceded that "[i]t can be difficult for anyone to make decisions about what is on the mind of another person."  But, she continued, "[Y]ou do it in your life every day.  Defensive driving is actually an example of

---

[45] State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).
[46] Lindsay, 180 Wn.2d at 434.
[47] Lindsay, 180 Wn.2d at 436.
[48] Lindsay, 180 Wn.2d at 436.

that. As you're driving you're constantly making judgments about what other drivers intend to do, and acting accordingly, based on circumstantial evidence." After the trial court overruled Cheng's objection, the prosecutor continued by telling the jury that people use circumstantial evidence "every day in your life to make reasonable inferences regarding the intents and conduct of other people." She again illustrated "draw[ing] reasonable inferences" in daily life:

> [W]hen you are sitting in the back of a restaurant and someone comes in with a wet rain coat and umbrella, even if you can't see what's going on outside, you say to yourself, it's raining outside because this person came in with a wet rain coat and umbrella. That's a reasonable inference you're using to draw conclusions based on your common sense and experience. And that's what the State is asking you to do regarding the defendant's intent in this case.[49]

In her rebuttal argument, the prosecutor referred to the jury instruction on circumstantial evidence and argued that the jury could infer "based on your common sense and experience" why Cheng called Kira and wrecked her house. She briefly referred again to the reasonable doubt standard.

The trial court did not abuse its discretion in allowing these comments. The prosecutor did not make the challenged comments to illustrate the State's burden of proof, as Cheng contends. Instead, she argued that the jury could reasonably infer that Cheng acted knowingly and maliciously because his "words

---

[49] In closing, Cheng's counsel reminded the jury of the gravity of its duty and stated that "[y]ou don't do anything in your daily life that is similar to the decision making process you are going through today."

and actions show[ed] what was on his mind." Elsewhere in her arguments, the prosecutor twice emphasized for the jury that the State's burden of proof was evidence beyond a reasonable doubt. In the context of the prosecutor's entire argument, her remarks are distinguishable from those in cases where prosecutors used everyday examples expressly to illustrate the burden of proof.[50] Thus, the prosecutor's arguments here were not improper.

Also, Cheng does not show that the comments prejudiced him. Misconduct is prejudicial only where "'there is a substantial likelihood the instances of misconduct affected the jury's verdict.'"[51]

Cheng fails to show this likelihood. As discussed above, the State presented ample evidence from which the jury could conclude that Cheng acted with knowledge and malice. The prosecutor here used the illustrations in the middle of her argument, not at the end where they would be more likely to cause prejudice.[52] And the trial court properly instructed the jury on the presumption of innocence, the burden of proof, and the definition of "beyond a reasonable doubt."[53]

---

[50] See Lindsay, 180 Wn.2d at 436.

[51] Dhaliwal, 150 Wn.2d at 578 (quoting State v. Pirtle, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)).

[52] Lindsay, 180 Wn.2d at 443.

[53] The jury is presumed to follow the trial court's instructions. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001).

Cumulative Error

Cheng alternately contends that this court should reverse based on cumulative error. The cumulative error doctrine applies when a combination of trial errors denies the accused a fair trial though none of the errors alone warrant reversal.[54] Because the trial court did not commit any of the errors Cheng asserts, the cumulative error rule does not apply.

Mandatory Legal Financial Obligations

Cheng challenges the trial court's imposition of two mandatory fees without finding he has the current or future ability to pay them. Cheng's argument is premature. Also, he cannot raise it for the first time on review, and he lacks standing to make it.

"The due process clause protects an indigent offender from incarceration based solely on inability to pay court ordered fees."[55] But "[a] preenforcement constitutional challenge to the mandatory DNA fee statute is ripe for review on the merits if the issue raised is primarily legal and does not require further factual development, and the challenged action is final."[56] Thus, "[a] constitutional challenge to the DNA fee statute is not ripe for review until the State attempts to

---

[54] In re Pers. Restraint of Yates, 177 Wn.2d 1, 65-66, 296 P.3d 872 (2013).

[55] State v. Shelton, 194 Wn. App. 660, 670, 378 P.3d 230 (2016), review denied, 187 Wn.2d 1002 (2017).

[56] Shelton, 194 Wn. App. at 670.

enforce collection of the fee. '[T]he relevant question is whether the defendant is indigent at the time the State attempts to sanction the defendant for failure to pay.'"[57]

Likewise, "'imposition of the [victim] penalty assessment, standing alone, is not enough to raise constitutional concerns.'"[58] And a defendant cannot show that an as-applied substantive due process claim is manifest constitutional error until the State seeks to enforce collection of the fee or impose a sanction for failure to pay.[59]

Cheng claims, for the first time on appeal, that the mandatory DNA fee under RCW 43.43.7541 and victim penalty assessment (VPA) under RCW 7.68.035 violate substantive due process when a court imposes them on an indigent defendant. He does not distinguish between the two fees.

This court squarely addressed Cheng's arguments in State v. Shelton,[60] holding that the defendant was procedurally barred from raising a substantive due process challenge to the DNA fees statute for the first time on appeal. This court held that the defendant's claim was not ripe until the State sought to

---

[57] Shelton, 194 Wn. App. at 672-73 (emphasis omitted) (second alteration in original) (quoting State v. Sanchez Valencia, 169 Wn.2d 782, 789, 239 P.3d 1059 (2010)).

[58] Shelton, 194 Wn. App. at 672 (quoting State v. Curry, 118 Wn.2d 911, 917 n.3, 829 P.2d 166 (1992)).

[59] Shelton, 194 Wn. App. at 672-73.

[60] 194 Wn. App. 660, 674, 378 P.3d 230 (2016), review denied, 187 Wn.2d 1002 (2017).

enforce collection or sanctioned the defendant for failing to pay.[61] This court also held the defendant lacked standing because he could not show harm until the State sought to enforce the fee.[62]

As in Shelton, nothing in the record here shows that the State has attempted to collect either fee or that it has imposed sanctions for failure to pay.[63] Thus, Cheng's as-applied substantive due process challenge is also not ripe for review.

Moreover, Cheng lacks standing because he cannot show harm until the State seeks to enforce collection of the fees.[64] And RAP 2.5(a)(3) prevents Cheng from raising his challenge for the first time on appeal because the claimed error is not "manifest" "[u]ntil the State seeks to enforce collection of the DNA fee or impose a sanction for failure to pay" and because "the record contains no information about future ability to pay the mandatory $100 DNA fee."[65] The same is true of the VPA.

---

[61] Shelton, 194 Wn. App. at 672-73. This court reaffirmed this holding in State v. Lewis, 194 Wn. App. 709, 715, 379 P.3d 129, review denied, 186 Wn.2d 1025 (2016).

[62] Shelton, 194 Wn. App. at 674 n.8.

[63] See Shelton, 194 Wn. App. at 673.

[64] Shelton, 194 Wn. App. at 674 n.8.

[65] Shelton, 194 Wn. App. at 675; see also State v. Stoddard, 192 Wn. App. 222, 228-29, 366 P.3d 474 (2016).

When the court declines to address the merits of the challenge, it must consider the risk of hardship to the parties.[66] However, "the potential risk of hardship does not justify review before the relevant facts are fully developed."[67] The record here contains no facts regarding Cheng's future ability to pay.

Accordingly, we decline to review Cheng's constitutional challenges to the mandatory fees.

<u>Appellate Costs</u>

Finally, Cheng also asks that no costs be awarded to the State on appeal. We generally award appellate costs to the substantially prevailing party on review. However, when a trial court makes a finding of indigency, that finding continues throughout review "unless the commissioner or clerk determines by a preponderance of the evidence that the offender's financial circumstances have significantly improved since the last determination of indigency."[68] Here, the trial court found Cheng was indigent. If the State has evidence indicating significant improvement in Cheng's financial circumstances since the trial court's finding, it may file a motion for costs with the commissioner.

---

[66] <u>Shelton</u>, 194 Wn. App. at 670.
[67] <u>Shelton</u>, 194 Wn. App. at 672.
[68] RAP 14.2.

CONCLUSION

Because the record shows the primary purpose of Kira's 911 call was to meet an ongoing emergency, the trial court properly admitted it. Because the prosecutor used everyday examples to illustrate circumstantial evidence, not the reasonable doubt burden, she did not commit misconduct. And Cheng's other arguments lack merit. Accordingly, we affirm.

Leach, J.

WE CONCUR:

Mann, J.

Cox, J.