IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35576-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JEAN PAUL WHITFORD, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Jean Paul Whitford challenges his conviction for driving under the influence of intoxicants (DUI). He asserts error in law enforcement's executing a warrant to extract his blood without providing him a copy of the warrant before the draw, the State's questioning its expert about the effect of alcohol on an experienced drinker, and the trial court's administration of the oath to a bailiff outside open court. We find no error and affirm the conviction.

FACTS

On May 2, 2015, Spokane County Deputy Sheriff Dustin Palmer, while on patrol, parked at a gas station in Spokane Valley. At approximately 12:40 a.m., Deputy Palmer heard a vehicle's engine revving and gears grinding. He observed a Honda Accord

speeding westbound on Valleyway.  Palmer gave chase as the driver, later identified as Jean Whitford, traveled through residential areas at a high rate of speed.  The vehicle turned onto a dead end street, after which Whitford turned off the Accord's headlights.  The car stopped at the end of the street and Whitford, with keys in hand, exited the vehicle.  Deputy Palmer seized and handcuffed Whitford.  Palmer smelled alcohol on Whitford's breath.

Deputy Dustin Palmer requested Deputy Todd Miller, another officer on patrol, to assist with the investigation since Miller specializes in DUI investigations.  When Deputy Miller arrived, he interviewed a handcuffed Whitford.  Miller observed Whitford's glassy eyes and smelled alcohol on Whitford's breath.  Whitford remarked that he visited a tavern, consumed five pints of alcohol, and was driving home.  Deputy Miller conducted the horizontal gaze nystagmus test and observed six out of six clues of intoxication.  Miller conducted no other field sobriety tests.  Miller decided to detain Jean Whitford for driving while under the influence of alcohol based on the gaze nystagmus test, Whitford's inconsistent answers, his speech, and his admission of consuming five pints of alcohol.

After transporting Jean Paul Whitford to jail, Sheriff Deputy Todd Miller garnered a warrant to seize some of Whitford's blood.  Miller showed Whitford a copy of the search warrant and read the special evidence warning to Whitford.  We do not know to what extent Miller showed a copy of the warrant to Whitford or to what extent Miller afforded Whitford the opportunity to read the warrant.  Miller did not give Whitford a

2

copy of the search warrant before its execution, but he delivered a copy of the warrant to jail staff so that Whitford could obtain possession of the warrant after being released from jail. A paramedic drew Whitford's blood at 2:43 a.m. The draw established two discrete blood alcohol contents of 0.242 and 0.243, the latter measurement corresponding to the time of the draw.

## PROCEDURE

The State of Washington charged Jean Whitford by amended information with felony driving while under the influence and first degree driving while license suspended or revoked. Whitford had prior DUI convictions that elevated the DUI charge to a felony. Before trial, Whitford pled guilty to first degree driving while license suspended.

At trial, the State called Andrew Gingras, a forensic scientist employed by the Washington state toxicology laboratory, as a witness. During direct examination, Gingras testified the results of the two tests conducted on Jean Whitford's blood evidenced a blood alcohol level of 0.242 and 0.243 respectively. The State then inquired:

> Q And does everyone act the same way at a .08? If you dose everyone in the courtroom up to a .08 level, would all be exhibiting the same signs and symptoms?
> A No.
> Q Why is that?
> A That has to do with something called tolerance. Individuals who are used to drinking alcohol can overcome some of deficits that they might have achieved from the alcohol itself. So a light drinker, someone who doesn't drink a lot of alcohol or has never consumed alcohol before, you can see a lot of typical signs of alcohol intoxication after their first drink, things like stuttered speech, loss of balance, loss of muscle movement.

3

Whereas individuals who are tolerant, have consumed a lot of alcohol throughout time, they wouldn't observe those same effects until after maybe the second, third, fourth, fifth drink, depending on that person's tolerance.

Report of Proceedings (RP) at 165-66.

During cross-examination, defense counsel asked Andrew Gingras about the absorption rate and the burn off rate at which the body eliminates the ethanol or alcohol.

The following colloquy then occurred:

Q  Now no two people are created equal; is that correct?
A  Yes.
. . . .
Q  The length and speed of the absorption rate would vary among individuals?
A  It does, yes.
Q  And you would have no way to know of what Mr. Whitford's burn off rate or absorption rate would be at this time?
A  I would only know if I were to observe and test.
Q  And you haven't had the opportunity to observe and test Mr. Whitford.
A  I have done neither.

RP at 172-73.

After questioning Andrew Gingras about retrograde extrapolation of a blood alcohol level, defense counsel asked about the signs an individual would display at varying levels of impairment.

Q  Now you have extensive experience about what different levels of alcohol will do to the human body, correct?
A  To some extent.  Obviously variances among individuals.  So what one person is at a certain level, you might not see in someone else.
Q  So just like in retrograde extrapolation there are outliers?

4

A  Yes.
Q  But you base your retrograde extrapolation on some general
principles.
A  Correct.
Q  In general, what signs would you see in an individual at a .08?

RP at 178.  Counsel specifically asked Gingras about how the imbiber would appear and

act with a blood alcohol concentration of 0.24.

On redirect examination, the State asked toxicologist Andrew Gingras,

Q  Okay. Now, sir, let's go back to the idea about tolerance.
Defense counsel asked you a lot about things that you would expect to see.
Now when we are talking about a seasoned drinker o[r] even someone who
may be an alcoholic, how does that affect your analysis?
A  So the outward affects would—that individual would appear—

RP at 183.  Defense counsel objected and moved for a mistrial.  Counsel contended that

the question prejudicially insinuated to the jury that Jean Whitford was an alcoholic.  The

State argued that it posed the question as a hypothetical exercise, rather than claiming

Whitford to seasonally drink.  The State indicated that it would, after the answer to the

question, ask Gingras about the impact of alcohol on an inexperienced drinker.  Since

defense counsel asked Gingras to testify about drinkers with varying levels of a blood

alcohol level, the State wished to show the variations of behavior depending on person to

person.

The trial court denied a mistrial.  The court commented that the State's question

did not suggest Jean Paul Whitford to be a seasoned drinker or alcoholic because of the

context in which the State asked the question.  The question was similar in nature to

questions asked by defense counsel. Nevertheless, the trial court stated it would, in fairness, likely render a curative instruction or strike the question. Defense counsel renewed the objection for a mistrial and drew comparisons to other words that would garner a prejudicial effect. In the event the court was still unwilling to grant a mistrial, defense counsel asked to strike the question and answer in open court once the jury was present. The court again denied the request for a mistrial, but struck the question and answer and further instructed the jury to consider both struck from the trial.

After closing arguments, the trial court administered the oath to a new bailiff who oversaw the jury. Jean Paul Whitford thereafter moved for a mistrial because the administration of the oath did not occur in open court. The trial court reserved a ruling until after the verdict. The jury convicted Jean Whitford of the felony DUI.

At sentencing, the trial court entertained Jean Whitford's motion for a new trial based on the bailiff's oath transpiring outside the courtroom. The court denied the motion.

## LAW AND ANALYSIS

On appeal, Jean Paul Whitford assigns three errors: the admission of testimony of his blood alcohol level in violation of his right to possess a copy of the blood draw warrant before the draw; the State's questioning of its expert whereby the State insinuated that Whitford was an experienced drinker, if not alcoholic; the trial court's assigning a new bailiff to the jury without notice to the parties and the trial court's

6

administrating the bailiff's oath outside open court. We address these contentions in such

order. We consolidate the last two assignments of error.

Copy of Blood Draw Warrant

CrR 2.3 controls the first issue on appeal. The court rule outlines some procedures

attendant to the execution of search warrants. CrR 2.3(d) states:

> The peace officer taking property under the warrant *shall give* to the person from whom or from whose premises the property is taken *a copy of the warrant* and a receipt for the property taken. If no such person is present, the officer may post a copy of the search warrant and receipt. The return shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the person from whose possession or premises the property is taken, or in the presence of at least one person other than the officer. . . .

(Emphasis added.) We note a blood drawing fits awkwardly inside the rule's reference to

"property" taken from "premises." Nevertheless, the State does not argue that a blood

draw falls outside the purview of the rule.

Jean Whitford argues Sheriff Deputy Todd Miller did not follow CrR 2.3 when he

failed to give him a copy of the search warrant before extracting blood. Whitford accuses

Miller of acting deliberately. Due to this alleged violation, Whitford believes the results

of the blood draw should have been suppressed. Whitford cites *State v. Linder*, 190 Wn.

App. 638, 360 P.3d 906 (2015), *State v. Ettenhofer*, 119 Wn. App. 300, 79 P.3d 478

(2003), and *United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999), *overruled on other*

*grounds by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008) to support his

7

position. In response, the State argues that the deputy did not need to provide a copy of the warrant before the extraction. The State also argues that any violation of the rule is not grounds for suppression unless the accused shows prejudice and Whitford shows no prejudice. The State cites *State v. Ollivier*, 178 Wn.2d 813, 312 P.3d 1 (2013). After mentioning the applicable principles, we review the four decisions.

Absent a constitutional violation, the rules for execution and return of a warrant constitute ministerial acts. *State v. Temple*, 170 Wn. App. 156, 162, 285 P.3d 149 (2012). Absent a showing of prejudice to the defendant, procedural noncompliance does not compel invalidation of the warrant or suppression of its fruits. *State v. Temple*, 170 Wn. App. at 162. The court's ministerial rules for warrant execution do not flow so directly from the Fourth Amendment's proscription on unreasonable searches that failure to abide by the rules compels exclusion of evidence obtained in execution of a search warrant. *State v. Temple*, 170 Wn. App. at 162; *State v. Kern*, 81 Wn. App. 308, 311, 914 P.2d 114 (1996). Other courts suppress evidence resulting from technical violations only when law enforcement deliberately disregards the rule or if the defendant establishes prejudice. *United States v. Gantt*, 194 F.3d at 994 (9th Cir. 1999).

With these principles in mind, we review decisions forwarded by the parties. In *State v. Ollivier*, 178 Wn.2d 813 (2013), emphasized by the State, our high court held that CrR 2.3(d) does not require that a copy of the warrant be provided to a suspect before the search is commenced. Law enforcement had reason to believe Brandon Ollivier

possessed child pornography on his computer. Detective Dena Saario obtained a search warrant for Ollivier's apartment. Ollivier was present when detectives searched his apartment and seized three computers, compact disks, and computer storage media. Saario did not hand Ollivier a copy of the warrant. She instead posted a copy of the warrant on a bookcase after conclusion of the search.

The Washington Supreme Court devoted the majority of its opinion, in *State v. Ollivier*, to Brandon Ollivier's claim that the State violated his speedy trial rights. In a summary response to Ollivier's contention that Detective Dena Saario violated CrR 2.3(d), the court reasoned that the rule did not require provision of a copy of the warrant before the search began. The court cited the majority view that law enforcement need exhibit or deliver a copy of the warrant only before departure from the premises. The *Ollivier* court ignored the rule's language that the law enforcement officer must give the accused a copy of the warrant if the accused is present. Posting of the warrant, if the accused is present, does not satisfy the rule. The *Ollivier* court technically read CrR 2.3(d) accurately, because the rule does not identify at what time the officer must hand the accused a copy of the warrant. One might, however, question the purpose of handing a copy of the search warrant to the accused after completion of the search.

We move to cases, on which Jean Paul Whitford relies. In *State v. Ettenhofer*, 119 Wn. App. 300 (2003), a Lewis County sheriff deputy procured a telephonic warrant to search the home of John Ettenhofer. Before approval of the warrant and during a

telephone call, the judge administered the witness oath to the deputy, and the deputy testified to the factual basis supporting probable cause. The judge found probable cause and authorized a search. The judge never signed a written warrant.

In *State v. Ettenhofer*, John Ettenhofer challenged his conviction on appeal on the basis that nobody executed a written search warrant, the judge did not affix his signature to the warrant, and the deputy failed to give Ettenhofer a copy of the warrant. This reviewing court invalidated the warrant and reversed Ettenhofer's conviction. We wrote:

> We hold that these failures constitute a warrantless search in violation of CrR 2.3(c), RCW 10.79.040, and article I, section 7 of the Washington State Constitution.

*State v. Ettenhofer*, 119 Wn. App. at 302. Note that, in this quote, the court referenced CrR 2.3(c), not CrR 2.3(d). CrR 2.3(c) does not expressly state that a search warrant be in writing, but the rule suggests a written warrant by the language:

> [I]t [the court] shall issue a warrant or direct an individual whom it authorizes for such purpose to affix the court's signature to a warrant.

Nevertheless, later in the opinion, the court discussed a violation of CrR 2.3(d). The court wrote:

> As principles of statutory construction require that we harmonize CrR 2.3(c) with other relevant rules, we next turn to CrR 2.3(d). That rule requires that "[t]he peace officer taking property under the warrant *shall give* to the person from whom or from whose premises the property is taken *a copy of the warrant* and a receipt for the property taken" (emphasis added). As these words are perfectly clear, the Supreme Court's intent with respect to subsection (d) is not open to debate; it expected that the person

10

searched would receive a physical document.  Therefore, an oral warrant like the one at issue here does not satisfy the dictates of CrR 2.3(d).
    Besides proving that CrR 2.3(c) requires a written warrant, section (d) has another function in this case.  As the officers did not have a written warrant, they could not have given Ettenhofer a copy of one as the rule commands.  Thus, the officers violated CrR 2.3(d) in addition to CrR 2.3(c).

*State v. Ettenhofer*, 119 Wn. App. at 305 (footnote omitted).

After addressing the violations of CrR 2.3(c) and 2.3(d), the *Ettenhofer* court reviewed whether the procedures used by the Lewis County sheriff deputy and judge violated RCW 10.79.040 and more importantly article I, section 7 of the Washington State Constitution.  The court reasoned that the warrant requirements evident in CrR 2.3, RCW 10.79.040, and the Washington Constitution are interrelated.  The court concluded that:

[T]he written warrant requirement so clearly evident in CrR 2.3 is also an aspect of the constitutional warrant requirement.

*State v. Ettenhofer*, 119 Wn. App. at 308.  The State argued that the provisions of CrR 2.3 were ministerial in nature and thus John Ettenhofer needed to show prejudice to invalidate the search warrant.  The court followed the rule that an unconstitutional search renders the search invalid and the defendant need not show prejudice.

*State v. Ettenhofer* supports the contention of Jean Paul Whitford.  Nevertheless, we struggle to apply the decision in this appeal.  The *Ettenhofer* court did not isolate the three discrete violations of CrR 2.3 as being sufficient alone to invalidate the warrant.

11

The court tied the requirement of delivering a copy of the warrant to the accused as bolstering its conclusion demanding a written warrant. The court only referred to "the written warrant requirement" as constitutionally imposed. *State v. Ettenhofer*, 119 Wn. App. at 308. *State v. Ollivier*, 178 Wn.2d 813 (2013), a Supreme Court decision filed ten years later, probably overrules *Ettenhofer* without mentioning the decision at least to the extent the *Ettenhofer* court discusses the failure to deliver a written search warrant to the accused.

In *State v. Linder*, 190 Wn. App. 638 (2015), police arrested Aaron Linder for driving with a suspended license. During the search incident to arrest, an officer found a small tin box inside the pocket of Linder's hoodie. Linder did not give consent to search, so officers applied for a search warrant. A judge signed the warrant near midnight, so, on return to the police station with the warrant, Sergeant Steven Parker worked alone. Parker opened the tin box, inventoried the box's contents, completed the return of service form, and deposited items from the box in an evidence locker. The contents included methamphetamine in cigarette wrapping. The next morning, another officer, also acting alone, verified the contents in the evidence locker as matching Sergeant Parker's inventory.

Aaron Linder moved to suppress the methamphetamine on the ground that Sergeant Steven Parker breached CrR 2.3(d)'s requirement of conducting the inventory in the presence of at least one other person besides the officer. The State argued against

12

suppression because of the ministerial nature of the rule violation. The trial court granted

Linder's motion and dismissed the case. We affirmed.

This court, in *State v. Linder*, agreed to the ministerial character of CrR 2.3(d), but

deemed this characterization irrelevant to exclusion of the evidence since some violations

of the rule can be consequential and some will not. We observed that, absent

suppression, Linder had no adequate remedy for someone's tampering with the evidence

since no one else could confirm the contents of the box on seizure. The violation could

not have been cured after the fact. Linder's only recourse would be to deny the accuracy

of the inventory in opposition to the word of a police officer, which, from common

experience, placed Linder at a disadvantage.

This court in *Linder* also found the credibility of the State's evidence impaired.

The trial court never found the inventory to be accurate. Instead the trial court wrote

handwritten changes to the proposed findings. The trial court changed a proposed finding

as to what "'Sergeant Parker found'" in the tin box to what "'Sergeant Parker *testified*

he found.'" *State v. Linder*, 190 Wn. App. at 645. The court also struck three proposed

findings that the items in the box were "accurately" captured by the sergeant's

photographs and "accurately" inventoried. *State v. Linder*, 190 Wn. App. at 645.

In *United States v. Gantt*, 194 F.3d at 990 (9th Cir. 1999), the appeals court

reviewed Fed. R. Crim P. 41(d), the federal analog to CrR 2.3(d). This rule has since

been renumbered Fed. R. Crim P. 41(f)(1)(C). The federal rule provided:

> [T]he officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken.

When the Federal Bureau of Investigation (FBI) executed a search warrant at Pamela Gantt's hotel room, agents did not present Gantt with a copy of the warrant. Instead, they directed her to sit in the hallway while they conducted a three-hour search. A three-hour search. The search started getting rough, when Gantt asked to see the search warrant. Agents briefly showed her the face of the warrant. After conducting the search, the agents left a copy of the warrant behind in the hotel room while agents transported Gantt to an FBI office.

The Ninth Circuit Court of Appeals, in *United States v. Gantt*, noted that rules for executing a warrant must be interpreted in the light of the important policies underlying the warrant requirement: to provide the property owner assurance and notice during the search. The United States Supreme Court has repeatedly observed that an essential function of the warrant is to assure the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search. The *Gantt* court wrote:

> If a person is present at the search of her premises, agents are faithful to the "assurance" and "notice" functions of the warrant *only if they serve the warrant at the outset of the search*. A warrant served after the search is completed cannot timely "provide the property owner with sufficient information to reassure him of the entry's legality."

*United States v. Gantt*, 194 F.3d at 991 (9th Cir. 1999), (citing *Michigan v. Tyler*, 436 U.S. 499, 508, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978)) (emphasis added).

The *Gantt* court held that the FBI officers violated Fed. R. Crim P. 41(d). Still, the court noted that not all violations of the rule demand suppression of the seized evidence. The court upheld the principle that violations require suppression only if law enforcement deliberately disregarded the rule or if the defendant was prejudiced. The *Gantt* court found suppression was justified because of a deliberate violation. The court found the violation deliberate because agents failed to show Gantt the complete warrant even after she asked to see it.

We note one decision on our own. In *State v. Temple*, 170 Wn. App. 156 (2012), Matthew Temple identified four errors committed by law enforcement when executing a search warrant: (1) the officer failed to file the search warrant affidavit, the search warrant, the search warrant return, and the search warrant inventory with the issuing court, (2) the search warrant return was not accompanied by the inventory of property seized, (3) the officer did not provide Temple with a copy of the warrant or a receipt for the property seized, and (4) the search warrant inventory was not made in the presence of any other person and falsely stated that it was. For an unknown reason, Temple did not argue that any of these errors alone invalidated the error, and he only argued constitutional error. This court did not view the failure to deliver a copy of the warrant to Temple as problematic.

15

We are uncertain whether to conclude that Sheriff Deputy Todd Miller violated CrR 2.3(d) by not providing Jean Whitford a copy of the warrant before executing it. We are bound by Washington Supreme Court decisions with regard to Washington court rules. Although the Supreme Court summarily addressed CrR 2.3(d) in *State v. Ollivier*, the decision stands for the proposition that law enforcement need not hand a copy of the search warrant to the accused, even if the accused is present, and can post the warrant in some convenient place after the search. Sergeant Todd Miller left a copy of the search warrant in a location where Whitford could gain possession of the copy.

Regardless of whether Todd Miller violated CrR 2.3(d), we conclude that the trial court did not err in denying Jean Paul Whitford's motion to suppress the evidence extracted from the blood draw. Even under the more liberal *Gantt* ruling, we must find prejudice or deliberate violation of the rule to suppress. Unlike in *State v. Linder*, the violation did not compromise the accuracy of the evidence. The underlying concerns with regard to a residence and possessions inside the home lack relevance to human bodies. A house may contain many rooms, and an owner may justifiably wish to know over what areas of the home officers may have authority to search. The blood draw constituted a limited scope search. Whitford advances no argument as to any potential prejudice.

The record does not support a finding that Deputy Todd Miller's actions were deliberate. On a common sense level, Miller exercised a choice whether to give Jean

16

Whitford a copy of a warrant before or after a search. He even showed a copy of the warrant to Whitford. Nonetheless, the *Gantt* case found an officer acted deliberately when the defendant specifically asked to survey the warrant, yet the officer still did not provide a copy. This appeal lacks those circumstances. We have no evidence that Deputy Miller intended to deprive Whitford of a known right to possess a copy.

Jean Whitford also argues that he possessed a constitutional right that demanded that law enforcement follow the strictures of CrR 2.3(d). We agree with the broad principle that a search warrant implicates the United States Constitution Fourth Amendment and art. I, § 7 of the Washington Constitution. Nevertheless, Whitford cites no authority for the proposition that an accused holds a constitutional right to the enforcement of state court rules. In *State v. Wraspir*, 20 Wn. App. 626, 628, 581 P.2d 182 (1978), this court held that the Fourth Amendment does not require immediate service of the warrant before the search may begin.

Question about Experienced Drinker

Jean Paul Whitford criticizes the prosecution for asking the State's expert on toxicology about the tolerance to alcohol of "a seasoned drinker o[r] even someone who may be an alcoholic." RP at 183. Whitford contends the question intimated that he was a practiced drinker or alcoholic and this intimation proffered an opinion of guilt. He highlights the stigma attached to the disease of alcoholism. Accordingly, the prosecution, as argued by Whitford, committed misconduct by inserting this insinuation before the

17

jury. Whitford further contends that, even if the trial court had given a curative instruction, jurors would still have retained their awareness of the prosecutor's inference. The State answers that the prosecution posed the question as a hypothetical question and in response to questions first raised by defense counsel.

A prosecutorial misconduct inquiry consists of two prongs: (1) whether the prosecutor uttered improper comments, and (2) if so, whether the improper comments caused prejudice. *State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). An appellate court reviews allegations of prosecutorial misconduct under an abuse of discretion. *State v. Lindsay*, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). A defendant bears the burden of showing that the prosecutor's comments are both improper and prejudicial. *State v. Lindsay*, 180 Wn.2d at 430. A prosecutor commits misconduct by conveying a personal opinion regarding the accused person's guilt or veracity. *In re Personal Restraint of Glassman*, 175 Wn.2d 696, 706, 286 P.3d 673 (2012).

We doubt the prosecution implicated Jean Whitford as a seasoned drinker or conveyed a personal opinion of guilt. The question came only on redirect examination and only after defense counsel asked the witness a series of hypothetical questions about the impairment of alcohol based on varying circumstances. The State intended to ask additional questions that confirmed the question as being a hypothetical not specifically directed to Jean Whitford. The prosecution also asked about a light drinker, yet Whitford does not accuse the State of labeling him a light drinker. Both parties presented evidence

about discrete individuals' tolerance to alcohol.  Defense counsel could have questioned the witness further to show that the witness had no scientific evidence to believe Whitford to be an experienced drinker.  Whitford argued, in part, in the course of the case that the blood alcohol level presented by the State must have been erroneous because his physical condition did not support this high count.

Regardless, we find no prejudice in the question.  The court struck the question and the answer.  The witness had barely begun to answer the question.  The State did not argue in closing that Jean Whitford was an alcoholic.  The court offered to deliver a curative instruction.

## Public Trial Right

Jean Paul Whitford next contends that the trial court violated his right to a public trial when the court administered the oath to a substitute bailiff outside the presence of the jury and outside the public courtroom.  This oath occurred at the end of the trial after closing arguments ended.  In reply, the State characterizes the oath of a bailiff as a ceremonious or administrative act by the trial court that need not occur in open court.  We agree with the State.

We first note the lack of any constitutional, statutory, or regulatory requirement that a bailiff who oversees a jury must be administered an oath.  Still, the lack of a legal demand for an event to occur during does not necessarily permit that event from being performed outside open court.

19

When addressing a defendant's constitutional right to a public trial, a reviewing court must first determine whether the proceeding at issue even implicates the public trial right constituting a closure. *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). Not every interaction between the court, counsel, and defendants will implicate the right to a public trial or constitute a closure if closed to the public. *State v. Sublett*, 176 Wn.2d at 71. To ascertain whether a defendant's public trial right has been violated, an appellate court engages in a three-part inquiry: (1) whether the proceeding at issue implicates the public trial right, (2) if so, was the proceeding closed, and (3) if so, was the closure justified. *State v. Smith*, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014). If an appellate court concludes that the right to a public trial does not apply to the proceeding at issue, the court does not reach the second and third steps in the analysis. *State v. Smith*, 181 Wn.2d at 519.

To resolve whether the public trial right attaches, the reviewing court applies the "experience and logic" test. *State v. Sublett*, 176 Wn.2d at 72-73. Under the experience prong, the court considers whether the proceeding at issue has historically been open to the public. *State v. Sublett*, 176 Wn.2d at 73. Under the logic prong, the court asks whether public access plays a significant positive role in the functioning of the particular process in question. A defendant must satisfy both prongs. Consideration is given to whether openness will enhance both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system. *State v. Whitlock*,

20

188 Wn.2d 511, 521, 396 P.3d 310 (2017).

In *State v. Parks*, 190 Wn. App. 859, 862, 363 P.3d 599 (2015), the defendant argued that the court violated his right to a public trial when the court swore in a large venire in the jury assembly room. In analyzing the experience prong of the open court test, this court found that swearing in the venire prior to selection was analogous to an administrative component of jury selection to which the public trial right did not attach. *State v. Parks*, 190 Wn. App. at 866-67.

We find the administration of the oath to a bailiff to be analogous to the administration of the oath to a jury venire. In addition, Jean Paul Whitford cites no decision that holds the swearing in of the bailiff must occur in open court. When an appellant cites no authorities in support of a proposition, the court need not search for authorities, but may assume that counsel, after diligent search, found none. *State v. Young*, 89 Wn.2d 613, 625, 574 P.2d 1171 (1978). The administration of the oath outside the presence of the public does not impact public confidence in the judicial system.

Jean Paul Whitford also contends that the trial court should have afforded notice to the parties before substituting a new bailiff to attend to the jury. Whitford cites no law in support of this contention. He asserts no prejudice resulting from a replacement of the bailiff. Therefore, we reject the contention.

No. 35576-4-III
*State v. Whitford*

CONCLUSION

We affirm Jean Paul Whitford's conviction for felony drinking under the influence of intoxicants.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J. Concur in result only

_____
Pennell, A.C.J.

22

No. 35576-4-III

FEARING, J. (concurring) — I question the holding in *State v. Ollivier*, 178 Wn.2d 813, 312 P.3d 1 (2013). The *Ollivier* court devoted most of its opinion to another issue. The court ignored CrR 2.3(d)'s language that the law enforcement officer must give the accused a copy of the warrant if the accused is present. Posting of the warrant, if the accused is present, does not satisfy the rule. The *Ollivier* court technically read CrR 2.3(d) accurately, because the rule does not identify at what time the officer must hand the accused a copy of the warrant. One might, however, question the purpose of handing a copy of the search warrant to the accused after completion of the search. Most accused may not read the warrant, but the accused should be afforded the opportunity to review the warrant in advance to confirm the legality of the search and the limits of the search's authorization.

Fearing, J.