# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58429-8-II |
| Respondent, | |
| v. | |
| MICHAEL RAYMOND ROGERS, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—A jury found Michael Rogers guilty of two counts of second degree assault by strangulation, a crime of domestic violence against his wife, LM-R. On the night of the assaults, LM-R called the police and then went to the emergency room with severe neck bruising, difficulty speaking, and painful swallowing, where she told her doctor that Rogers had strangled her multiple times and to the point of passing out. At trial, the State presented photos of LM-R's neck injuries and testimony from multiple witnesses who said that LM-R told them she had been strangled and the bruising looked like hand marks around her neck.

LM-R testified at trial that she was intoxicated on the night of the incident and that she could not remember what she told police or her doctor. LM-R denied being strangled, testifying instead that her neck injuries arose when she tried to hang herself. However, her treating physician and an officer who saw the marks testified that the marks on her neck were inconsistent with hanging.

Rogers appeals, arguing that he did not receive a fair trial as a result of prosecutorial misconduct in the State's closing remarks. Specifically, he argues that the prosecutor improperly denigrated defense counsel by suggesting counsel encouraged a witness to lie, told jurors that they would have to believe a police officer and doctor lied in order to acquit, used impeachment evidence as substantive evidence, and otherwise misstated the testimony. Rogers alternatively argues that his counsel was ineffective for failing to object to some of the allegedly improper statements. Finally, Rogers argues that if we do not grant other relief, he is entitled to remand for the trial court to strike the $500 crime victim penalty assessment from his judgment and sentence due to his indigency, and the State concedes that he is entitled to this alternative relief.

We affirm Rogers' convictions, but we remand for the trial court to strike the crime victim penalty assessment from Rogers' judgment and sentence.

FACTS

I. BACKGROUND

At the time of the incident, Rogers and Miller-Rogers lived in Centralia with their four children and LM-R's uncle, Scott Miller. Rogers and Miller-Rogers both had recent bouts of depression and anxiety and were having financial difficulties. Shortly after LM-R became pregnant with their fifth child, LM-R found out that Rogers was unfaithful to her. As a result, Rogers and LM-R made a "pact to restore the marriage" under which LM-R promised to stop drinking. 1 Verbatim Rep. of Proc. (VRP) (June 7, 2023) at 380.

A.     Assaults

On the day of the assaults, LM-R took her prescribed antianxiety and antidepressant medications and drank a six pack of beer. Rogers began criticizing LM-R's drinking, the couple

2

argued loudly, and LM-R struck Rogers with a pillow. At one point, Rogers became so angry that he threw his laptop on the ground.

The argument awoke Miller, LM-R's uncle, who found Rogers and LM-R "throwing insults back and forth at each other." 2 VRP (June 7, 2023) at 526. Miller tried to deescalate the fight by getting between the couple to hold back LM-R, who was trying to "grab or scratch" at Rogers. *Id.* at 527. Miller was ultimately unable to deescalate the fight, so he left to bring the couples' infant to a quieter part of the home.

When LM-R tried to leave the room, Rogers "grabbed" LM-R from behind by her collarbone. 1 VRP (June 7, 2023) at 362-63. Rogers also grabbed LM-R's arms and tried to prevent her from leaving, and LM-R accidentally struck Rogers with her elbow as she was trying to escape his grip. When she was able to get away, LM-R ran to their detached garage, intending to lock the door so she could "be alone and not have to continue fighting or worry about things getting worse." *Id.* at 371. Once in the garage, LM-R stacked boxes in front of the door to prevent Rogers from entering the garage. Meanwhile, Rogers found Miller and told him he was worried that LM-R would hurt herself. Miller then saw Rogers looking for LM-R and banging on the garage door in a panic.

LM-R said that after going into the garage, she decided to attempt suicide by hanging herself with electrical wire. LM-R testified she tied the electrical wire to a rafter, but before she could tie a secure knot for her neck, she heard Rogers approaching. According to LM-R, she then looped the excess wire around her neck approximately three times and held it in place with her hands as she suspended herself from the wire. Rogers then broke the garage door window and grabbed LM-R by the legs. The wire "unraveled itself" once LM-R let go of it, and she fell to the

3

ground. *Id.* at 385. Miller approached the garage to see if anyone needed help, but he could not hear anything, so he went back inside. However, according to LM-R, Rogers was "angry" and "screaming" something akin to, "'What are you thinking? How could you?'" *Id.* at 390.

According to LM-R, she grabbed a shard of glass and Rogers restrained LM-R's neck with the crook of Rogers' elbow, trying to get the glass away from LM-R. LM-R said that Rogers eventually wrestled the glass away from her and threw it in the opposite direction, then walked around LM-R to go back inside the house. Miller was inside when Rogers returned, and he saw that Rogers was concerned about LM-R's safety.

According to LM-R, she then went inside and found Rogers was still "infuriated" and was "screaming at [her], like 'How could you do this? How could you do it to our kids? How could you be so irresponsible?'" *Id.* at 395-96. LM-R became upset that Rogers was not sympathetic and threatened to call the police to "deescalate the situation" by telling Rogers "to stop." *Id.* at 397-98. LM-R then walked to a nearby motel and, according to Miller, Rogers left shortly thereafter but did not say where he was going.

B.     Police Investigation and Medical Treatment

LM-R asked the motel receptionist to call 911 and then reported that she had been assaulted. Sergeant Patricia Finch responded to the motel and found LM-R with red marks around her neck. Sergeant Finch asked LM-R why she called 911 and, based on her response, was concerned that LM-R had been strangled. Sergeant Finch overheard LM-R telling a consistent version of events to medics, who then transported LM-R to the emergency room.

At the emergency room, LM-R told Dr. Amelia Servin that Rogers had strangled her "multiple times and to the point where she passed out" and that she had "been thrown" during the

altercation. 1 VRP (June 6, 2023) at 275, 281. LM-R also complained of "difficulty with her voice and swallowing." *Id.* at 276. Dr. Servin observed "circumferential" bruising on LM-R's neck that was consistent with strangulation, including "a couple of bruises that specifically looked like fingerprints." *Id.* at 283. Dr. Servin saw similar bruises on LM-R's upper arms, chest, and hip. Dr. Servin diagnosed LM-R with strangulation, bruising, and concussion. Dr. Servin based her strangulation diagnosis on LM-R's statements and the marks around LM-R's neck.

While LM-R was at the hospital, Sergeant Finch took a recorded statement from LM-R and photographed LM-R's injuries. On one side of LM-R's neck, Sergeant Finch could see a mark "consistent with a thumbprint." *Id.* at 256. On the other side of LM-R's neck, Sergeant Finch saw "markings consistent with four fingers of the hand." *Id.*

When LM-R went home in the early morning, Rogers was not there. Later that morning, Rogers returned with a friend to get his car keys, then left immediately. LM-R called 911 and gave the friend's address to the police. Officers went to the friend's house, where they found Rogers "running out the back door into the alleyway," and then arrested Rogers. 2 VRP (June 7, 2023) at 533. Rogers then voluntarily gave a recorded statement, alleging that LM-R started the fight by striking him with a pillow and that he used physical force only to prevent LM-R from harming herself.

A different officer then interviewed LM-R about Rogers' version of events. LM-R told the officer that when Rogers hooked his elbow around her neck, impacting her breathing, she was not holding a glass shard. LM-R also said that Rogers could not have seen inside the garage before breaking the glass and that the cable had never tightened around her neck. The officer saw a wire

hanging from the garage rafter, but the wire was not tied into a noose. The officer also saw marks on LM-R's neck that were inconsistent with hanging.

The State charged Rogers with two counts of second degree assault "by strangulation or suffocation" against an intimate partner, a crime of domestic violence. Clerk's Papers at 1-2. The next day, LM-R provided a new statement to law enforcement in an attempt to change what she told officers while intoxicated, claiming that her memory of the night in question was improving. In her statement she wrote, "'They said they saw hand marks around me, so I thought that's what had happened.'" 1 VRP (June 7, 2023) at 425.

## II. TRIAL

At trial, Rogers acknowledged physically restraining LM-R from leaving the bedroom and making contact with LM-R's neck while trying to reach the shard of glass but argued that his use of force against LM-R was reasonable to prevent LM-R from harming herself or harming Rogers.

A.      Testimony About the Altercation

The witnesses testified as described above. Generally, LM-R denied that Rogers had strangled her and could not recall ever passing out. LM-R also testified that she could not recall Rogers grabbing her neck. But LM-R later agreed that Rogers' contact with her neck during the struggle "made it so that [she] couldn't breathe," explaining that she remembered becoming "physically weak because [she] was so tired," but added that could have been caused by having the wire around her neck moments earlier. 1 VRP (June 7, 2023) at 417. She said Rogers did not threaten to harm her, and she did not remember saying he threw her around; instead, Rogers was trying to prevent her from harming herself. When asked about the length of the argument, she testified, "I could guess a couple of hours." *Id.* at 404**.**

Miller testified that he tried to stop the fight. Miller corroborated that Rogers was "concerned" about LM-R hurting herself but did not testify that he witnessed LM-R attempting suicide or that he witnessed Rogers intervening. 2 VRP (June 7, 2025) at 514.

On cross-examination, Miller agreed that LM-R was the aggressor and said he had to physically stop LM-R as she reached over his head to get at Rogers. Miller did not otherwise say that any of the fight was physical.

B.      Testimony About the Police Investigation

LM-R testified repeatedly that she could not remember what she told law enforcement when she was interviewed on the night of the fight. Similarly, Miller, who was interviewed the day after the assaults, testified that he could not remember what he told the officer because he was "flustered." 2 VRP (June 7, 2023) at 517.

LM-R blamed her poor memory on the "chaos" of the evening and on her intoxication, which she said would have been obvious to those who observed her that night. 1 VRP (June 7, 2023) at 406. Miller corroborated that LM-R was obviously intoxicated. By contrast, Dr. Servin testified that LM-R "never appeared intoxicated" and never slurred her speech or passed out, though LM-R's blood alcohol content was 0.155. 1 VRP (June 6, 2023) at 311. Sergeant Finch also denied that LM-R appeared noticeably intoxicated.

LM-R also testified that she could not recall statements she made to the officer who interviewed her the following day. She also said that to the extent she made statements in that interview that were inconsistent with her testimony, the prior statements were coerced. She testified in detail about the interviewing officer allegedly threatening to arrest her for hitting Rogers with a pillow and saying that her children would be placed in foster care if she made

statements that were inconsistent with what she reported the night of the assault. The officer denied these allegations.

Later, the State impeached LM-R with statements she made on the night of the incident. According to Sergeant Finch, LM-R "went into much more detail" about the strangulations in her recorded statement taken at the hospital the night of the assaults. 2 VRP (June 7, 2023) at 573. Specifically, in that interview, LM-R described two distinct times Rogers had strangled her that night. LM-R said that Rogers had "used his hand, and she wasn't sure which one, to put it around her throat and push her out of the bedroom into the bathroom door." *Id.* LM-R also told Sergeant Finch that Rogers had "put his arms around her neck in what she described as a choke-hold, at which point she passed out." *Id.* at 574. LM-R also "said she was gasping for air, couldn't breathe, and she fell on her back," and while she was on the ground, Rogers "straddled her" and "punched the ground and said he was going to hit her like a man." *Id.* at 575-76. According to Sergeant Finch, LM-R also "described being thrown around the house. And she used the words 'like a rag doll.'" *Id.* at 574-75. The jury was contemporaneously instructed that these statements were admitted only for the purpose of evaluating LM-R's credibility and not for any other purpose.

Sergeant Finch then testified that after her interview, LM-R told her that she no longer wanted to cooperate with the prosecution. When asked why LM-R did not want to cooperate, Sergeant Finch testified, "She told me that she was in love with Mr. Rogers and that he was the primary financial provider for the home, that they had four children together and she could not afford for him to be -- to go away for this." *Id.* at 582. Sergeant Finch, a federally certified domestic violence instructor with expertise in investigating domestic violence, also testified that victims often recant or minimize their abuse reports due to "love for the perpetrator, financial dependence,

[and] emotional dependence" as well as "fear of the perpetrator and fear of the children being either taken away or not financially supported." *Id.* at 566.

C.     Evidence of LM-R's Injuries

The State introduced evidence of LM-R's injuries through both testimony and images. Sergeant Finch described the neck injuries:

> On one side of her neck, she had what looked to be a mark consistent with a thumbprint or a thumb, a round kind of thumb, and then kind of scratches on the other side -- or I guess redness on the other side of her neck, markings consistent with four fingers of the hand.

1 VRP (June 6, 2023) at 256. Sergeant Finch, explained that the marks were "consistent with a hand around the neck." *Id.* at 256-57. Similarly, Dr. Servin, the treating physician, testified, "Because [the bruising] was circumferential on both sides, it does appear to be strangulation marks; and there were a couple of bruises that specifically looked like fingerprints." *Id.* at 283.

Photos of LM-R's injuries were admitted and shown to the jury, and Sergeant Finch pointed out "markings consistent with . . . four forefingers" on the right side of her neck as well as a "thumbprint" on the left side of her neck. *Id.* at 259, 261. The photos also showed LM-R's other injuries, including scratches, bruising, and swelling. On cross-examination, Dr. Servin agreed that the red marks in the photos of LM-R's neck could have been created in "a variety of ways" including "without intending to restrict air or blood flow." *Id.* at 290, 292.

The State also elicited testimony about what LM-R told Dr. Servin for the purpose of medical diagnosis and treatment. For instance, Dr. Servin testified that LM-R reported "that she was assaulted, that she'd been strang[led] and hit pretty significantly" by Rogers. 1 VRP (June 6, 2023) at 272. Dr. Servin also testified that LM-R said she was "strang[led] multiple times and to the point where she passed out and then now was having difficulty with her voice and swallowing."

*Id.* at 275-76. Dr. Servin explained that this information was important to her medical treatment because "loss of consciousness . . . shows that possibly at some point in time her brain did not get enough oxygen." *Id.* at 276.

Rogers cross-examined Dr. Servin about the basis of her concussion diagnosis and emphasized that Dr. Servin relied on LM-R's statements. Rogers asked questions about accidental suffocations, including choke holds, and ultimately elicited that the suffocation could have been accidental. On redirect, Dr. Servin explained that a choke hold does not typically leave bruising around the neck and that the photos of LM-R's injuries did not indicate she was placed in a choke hold.

Dr. Servin also testified that with patients who hung themselves, she typically sees a "definite linear pattern" formed by whatever the patient tied around their neck, and that in LM-R's case, those markings were absent. *Id.* at 309. The officer who interviewed LM-R the morning after the assaults also explained that the marks on LM-R's neck were inconsistent with hanging.

D.    Closing Arguments

The jury was instructed that attorney arguments are not evidence and to rely on the testimony as they remembered it.

The State's closing argument and accompanying slideshow emphasized the jury instructions, the photos showing LM-R's injuries, and the implausibility of Rogers' alternative explanation. Throughout closing, the prosecutor mentioned multiple times that Dr. Servin testified that LM-R was "strangled three times," though that was not Dr. Servin's testimony. 2 VRP (June 8, 2023) at 671.

The prosecutor displayed the photos of LM-R's neck and described the testimony supporting that the photos showed finger marks. The prosecutor pointed out "at least three parallel lines" positioned "front to back, just as they would be if someone was grabbing you around the neck." *Id.* at 668. Then, the prosecutor argued that LM-R's attempted hanging would not result in marks like the ones in the photos. The prosecutor also pointed to marks allegedly showing "the webbing of the hand" and "two dots" allegedly showing "thumbprint[s]." *Id.* Additionally, the prosecutor argued, "You can see . . . [c]lear distinct red lines in the exact area where you would grab somebody by the neck." *Id.* at 672.

The prosecutor also presented argument and a slide about the difference between substantive and impeachment testimony. The prosecutor explained that LM-R's testimony was substantive evidence, but that she was contradicted significantly by impeachment evidence. The prosecutor described aspects of LM-R's testimony that supported conviction, including that the argument "lasted hours." *Id.* at 659. The prosecutor challenged Rogers' theory that he was acting to prevent LM-R from harming herself after seeing "the glass shard in her hand" and "the wire in the garage," by arguing that "the only evidence that this was why he acted came from [LM-R]." *Id.* at 655. Then, the prosecutor challenged LM-R's credibility from many angles, contrasting her testimony with the testimony of the other witnesses and with common sense. For instance, the prosecutor relied on Sergeant Finch's expert testimony to argue that LM-R was minimizing the abuse.

Rogers, in his closing argument, reminded jurors that the comments about what LM-R told law enforcement were not admitted as substantive evidence but should be considered only for impeachment. Rogers relied on LM-R's testimony, arguing she created a reasonable doubt and

emphasized that LM-R was intoxicated and angry with her husband when she made any prior inconsistent statements on the night of the incident. He argued that the photos were actually consistent with LM-R's testimony because she said she wrapped the cord around her neck three times. Further, Rogers argued that compressing LM-R's neck in an effort to take away the piece of glass or to prevent harm to herself is not unlawful force under the jury instructions. Finally, Rogers attempted to dispute that LM-R recanted out of dependence on Rogers.

The State, in rebuttal, argued that Miller and LM-R were biased and their inconsistent statements undermined their credibility. The State told the jury, "[I]f your conclusion is that biased, impeachable -- impeached evidence is what you want to go with, that's fine, but that's what supports the defendant's theory of the case." 2 VRP (June 8, 2023) at 714. In response to the argument that Rogers was trying to save LM-R, the prosecutor reminded the jury that during the argument, Rogers "punch[ed] the floor, yelling at her 'You deserve this.'" *Id.* The prosecutor went on to argue that "Sergeant Finch and Dr. Servin, they would have just had to lie" for the jury to believe the defense theory that LM-R was intoxicated when she reported Rogers had strangled her. *Id.* at 716. The prosecutor also pointed out that Miller's testimony was inconsistent:

> Scott [Miller] told you [LM-R] was the aggressor. It supports the defense theory of the case. When did he say that? All through direct examination the only thing Scott is telling you is that they're arguing. [Defense counsel], "Hey, Scott, psst, remember when we had this conversation and you actually said that [LM-R] came after [Rogers]?" "Oh, yeah, yeah, yeah, yeah. I remember that now. Yeah, [LM-R] was really going after him." Credible or not? I leave that to you.

*Id.* at 716-17.

E.      Motion for Mistrial

Immediately after the jury began deliberating, Rogers moved for a mistrial and argued that the State's closing was improper because it implied defense counsel was prompting Miller to

perjure himself. The State responded that it was not implying perjury but rather emphasizing "the fact that [defense counsel] had to remind him" of his earlier comment. 2 VRP (June 8, 2023) at 723. The court briefly researched the issue and then denied the motion. The court explained that although the comment may have been "ill-advised," it was a proper argument about Miller's credibility and in the totality of the argument, it was not likely to affect the verdict. *Id.* at 726.

The jury later returned a guilty verdict on both counts. The trial court sentenced Rogers to 12 months plus 1 day of confinement for each count. The trial court waived some fees due to its finding that Rogers was indigent, but imposed a $500 crime victim penalty assessment.

Rogers appeals.

## ANALYSIS

### I. PROSECUTORIAL MISCONDUCT

Rogers argues that he did not receive a fair trial due to several instances of alleged prosecutorial misconduct. We disagree.

### A. Denigration of Defense Counsel

Rogers argues that the prosecutor made comments denigrating the integrity of his attorney by "insinuating that [Miller] was making up his testimony and that counsel was involved." Appellant's Opening Br. at 43. Specifically, Rogers challenges the portion of the prosecutor's rebuttal argument suggesting Miller adjusted his testimony based on reminders that defense counsel conveyed during his questioning. Rogers preserved this assignment of error by moving for a mistrial on the same basis immediately after closing arguments. *See also State v. Lindsay*, 180 Wn.2d 423, 430-31, 326 P.3d 125 (2014) (mistrial motion after closing remarks is sufficient to preserve challenges to prosecutor's comments in closing).

Defendants are guaranteed a fair trial in a criminal case under the Sixth and Fourteenth Amendments to the United States Constitution and under article I, section 22 of the Washington Constitution. *State v. Gouley*, 19 Wn. App. 2d 185, 200, 494 P.3d 458 (2021). A prosecutor's misconduct may deprive a defendant of the constitutional right to a fair trial. *Id.* Defendants alleging prosecutorial misconduct must show that the challenged conduct was "both improper and prejudicial." *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). We review the challenged conduct "in the context of the whole argument, the issues of the case, the evidence addressed in argument, and the instructions given to the jury." *State v. Scherf*, 192 Wn.2d 350, 394, 429 P.3d 776 (2018).

Where, as here, the defendant preserved the alleged error, "the defendant must show (1) that the prosecutor's remarks were improper and (2) that there is a substantial likelihood the misconduct affected the verdict." *Gouley*, 19 Wn. App. 2d at 200.

The Washington Supreme Court has explained that "prosecutors have 'wide latitude to argue reasonable inferences from the evidence,' but they 'must seek convictions based only on probative evidence and sound reason.'" *State v. Loughbom*, 196 Wn.2d 64, 77, 470 P.3d 499 (2020) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (plurality opinion)). Prosecutors "must not impugn the role or integrity of defense counsel." *Lindsay*, 180 Wn.2d at 431-32. Terms such as "bogus," "a crock," and "sleight of hand" used to discredit defense counsel's argument have all been held to be improper. *Id.* at 434.

Here, to some extent, the prosecutor was accurately pointing out Miller initially testified that Rogers and LM-R were arguing, but then added that LM-R was the aggressor when asked a

leading question on cross-examination. And the prosecutor asked the jury, "Credible or not? I leave that to you." 2 VRP (June 8, 2023) at 717. Thus, in context, the challenged comment was directed at Miller's credibility in light of his changing testimony.

However, to the extent the prosecutor went beyond pointing out inconsistent testimony and implied that defense counsel was intentionally eliciting false testimony, the comment was more than ill-advised, it was improper. *See Lindsay,* 180 Wn.2d at 433-34. And although the State argues that defense counsel invited any error by mentioning that people do not always believe defense attorneys, we disagree. A self-deprecating remark does not open the door to allowing the prosecution to state or imply counsel encouraged perjury.

Even so, Rogers cannot show that the improper suggestion to the jury had a substantial likelihood of affecting the verdict given that the jury could see for itself how Miller's testimony changed after a leading question. Rogers maintains that the allegedly improper arguments could have been the decisive factor because he presented evidence that LM-R was drunk; there was a wire tied around the garage rafter and the glass on the garage window was broken; some of Miller's testimony supported Rogers' version of events, including that LM-R was the aggressor; and the doctor's acknowledgment that something other than strangulation could have caused LM-R's injuries. But on balance, having reviewed the record, we disagree with Rogers' assessment of the weight of the evidence. It is unlikely the prosecutor's improper suggestion that defense counsel was encouraging Miller to lie would have had a substantial likelihood of affecting the verdict.

In addition to the fact that the jury could assess any conflicts in Miller's testimony for itself, the jury was also aware of the State's other evidence in this case. The jury saw several photos of LM-R's neck and had the opportunity to evaluate whether the photos showed hand marks, meaning

finger marks on one side and a thumb mark on the other, as Sergeant Finch and Dr. Servin testified they did. And although LM-R repeatedly testified that Rogers did not strangle her, she made many statements indicating Rogers was extremely angry that night and that she tried to get away from him multiple times. LM-R even testified that she struggled to breathe after Rogers hooked his elbow around her neck.

Rogers agrees that LM-R gave a consistent version of events throughout the first 24 hours after the assaults, including in the morning after she had time to sober up. Dr. Servin's testimony provided substantive evidence that LM-R said that Rogers had strangled her. Although LM-R denied telling Sergeant Finch the same thing, that portion of LM-R's testimony was thoroughly impeached. And two witnesses testified that LM-R's injuries were not consistent with hanging. Additionally, it is undisputed that Rogers fled the home while police were searching for him, raising a permissible inference of his consciousness of guilt. *See State v. Slater*, 197 Wn.2d 660, 667-70, 486 P.3d 873 (2021).

Moreover, the jury heard compelling testimony that LM-R was motivated to recant because Rogers "was the primary financial provider for the home, that they had four children together and she could not afford for him to be -- to go away for this." 2 VRP (June 7, 2023) at 582. This was paired with expert testimony explaining how minimization and recantation often present in domestic violence cases. And although LM-R recalled the rest of the night in great detail, her testimony when asked about Rogers' contact with her neck was vague and inconsistent. The jury was in the best position to decide which testimony to believe, and we "must strongly defer to the jury's determinations of credibility." *Duc Tan v. Le*, 177 Wn.2d 649, 672, 300 P.3d 356 (2013). Here, the jury determined that LM-R's recantation was not credible, and we conclude that there

16

was not a substantial likelihood that absent the prosecutor's improper statements, the jury would have come to a different conclusion.

Thus, despite LM-R's recanting testimony, it is unlikely the prosecutor's denigration of defense counsel during Miller's testimony would have changed the verdict, especially in light of the photographs, law enforcement testimony, and Dr. Servin's testimony about the injuries to LM-R's neck. Finally, we note that the jury was instructed that attorney comments are not evidence and we presume that the jury follows its instructions. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). In sum, there is no substantial likelihood the challenged argument would have affected the verdict, so Rogers cannot show prejudice.

B.      Other Alleged Prosecutorial Misconduct

Rogers also alleges that he was deprived of a fair trial due to several other instances of prosecutorial misconduct that he did not preserve by objecting at trial. Namely, he argues that the prosecutor committed misconduct when he told jurors that they would have to believe a police officer and doctor lied in order to acquit, used impeachment evidence as substantive evidence, and otherwise misstated the testimony.

Because Rogers failed to object or move for a mistrial on these grounds, his misconduct claim is waived unless he shows "(1) that comments were improper, (2) that the prosecutor's comments were both flagrant and ill-intentioned, (3) that the effect of the improper comments could not have been obviated by a curative instruction, and (4) a substantial likelihood the misconduct affected the verdict." *Gouley*, 19 Wn. App. 2d at 201. "In evaluating whether the defendant has overcome waiver in cases where an objection was not lodged, we will 'focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the

resulting prejudice could have been cured.'" *Id.* (quoting *Emery*, 174 Wn.2d at 762). If a nonobjecting defendant does not show that the improper remarks were incurable, their claim "necessarily fails and our analysis need go no further." *Emery*, 174 Wn.2d at 764.

Even if the prosecutor's arguments were improper, Rogers has not shown that any error arising from these statements could not have been cured with instruction. Rogers contends that the prosecutor improperly argued, "Sergeant Finch and Dr. Servin, they would have just had to lie" when they testified LM-R did not appear intoxicated in order for the jury to believe the defense theory. 2 VRP (June 8, 2023) at 716. Specifically, the defense contended that LM-R was highly intoxicated and therefore unaware of what she was saying when she initially told Finch and Servin that Rogers had strangled her.

Rogers is correct that it is improper for the State to argue that in order to acquit the defendant, the jury must find that the State's witnesses are lying. *State v. Vassar*, 188 Wn. App. 251, 260, 352 P.3d 856 (2015). But to the extent those comments were an improper argument, an instruction could have cured any resulting prejudice. *See State v. Riley*, 69 Wn. App. 349, 351-54, 848 P.2d 1288 (1993) (curable error where the prosecutor argued that in order to believe defendant's story, the jury would have to disbelieve the testimony of the police officers); *State v. Barrow*, 60 Wn. App. 869, 874-75, 809 P.2d 209 (1991) (curable error where prosecutor argued, "'[I]n order for you to find the defendant not guilty on either of these charges, you have to believe his testimony and you have to completely disbelieve the officers' testimony. You have to believe that the officers are lying.'").

Similarly, the alleged error of using impeachment evidence as substantive evidence would also have been cured with the instructions the trial court gave, telling the jury that the impeachment

evidence could only be used when evaluating LM-R's credibility. It is true that the prosecutor was drawing on impeachment testimony when he described Rogers "punching the floor," and no witness specifically testified that Rogers had said LM-R "'deserve[d] this.'" 2 VRP (June 8, 2023) at 714. But just moments prior to the impeachment testimony in question, the court read to the jury a limiting instruction. The jury received the same instruction several times throughout trial and it was repeated in closing arguments, and we presume the jury follows its instructions.

Finally, we note that the other alleged errors appear to be either unintentional misstatements or not misstatements at all. For instance, the prosecutor's inaccurate statement that Dr. Servin testified to "three" strangulations when she actually testified to "multiple" strangulations, appears to be an honest mistake based on LM-R's medical record—even defense counsel made a similar mistake in a posttrial motion. 1 VRP (June 6, 2023) at 275; 2 VRP (June 8, 2023) at 671. Additionally, although the evidence on balance suggests a relatively short timeline, the prosecutor's statement that the argument "lasted hours" was supported by LM-R's response when asked how long the argument lasted: "I could guess a couple of hours." 1 VRP (June 7, 2023) at 404. Rogers also argues that the prosecutor misstated the evidence by arguing that the only evidence that Rogers was actually trying to protect LM-R from harm came from LM-R's testimony, which was unreliable. But Miller also testified about Rogers' concern that LM-R would try to hurt herself. To the extent the prosecutor misspoke, this was already mitigated by the jury instruction that attorney arguments are not evidence and the jury should rely on its own recollection of the testimony. And it could have been further cured by a corrective instruction had defense counsel objected to the misstatement. *Emery*, 174 Wn.2d at 764. Furthermore, as we note above,

Rogers has not shown that the allegedly improper comments could have prejudiced the outcome of his case.

Therefore, we conclude that Rogers' prosecutorial misconduct arguments all fail because even to the extent any comments were improper, they were curable and were not prejudicial.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Rogers argues alternatively that his counsel was ineffective. We disagree.

Defendants arguing ineffective assistance of counsel must show both deficient performance and prejudice to obtain a reversal. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Performance is deficient if it falls below an objective standard of reasonableness, and we strongly presume counsel's conduct was reasonable. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35-36, 296 P.3d 872 (2013). To rebut this presumption, the defendant must show the absence of any legitimate trial tactic explaining counsel's performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Prejudice requires showing "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Yates*, 177 Wn.2d at 36 (quoting *Strickland*, 466 U.S. at 694).

Here, Rogers argues that his counsel performed deficiently by failing to object to alleged prosecutorial misconduct as described above. Although he acknowledges that failing to object to fleeting misconduct can be a legitimate trial tactic, he maintains that the misconduct here was "egregious" and "pervasive" such that the failure to object could not have been a strategic decision. Br. of Appellant at 62-63. We disagree because, as we explain above, existing jury instructions already diminished the impact of many of the alleged errors, and other alleged misconduct was tangential and minor in light of the other evidence the State presented. In these circumstances, it

was legitimate for defense counsel to choose not to object to avoid drawing more attention to potentially damaging evidence. Because Rogers has not met his burden to show the absence of a legitimate trial tactic, we conclude he has not shown deficient performance.

Similarly, even assuming he could show deficient performance, Rogers has not shown prejudice because, as we conclude above, the alleged misconduct was unlikely to affect the verdict because of LM-R's physical injuries, the photos of those injuries, and the testimony of Sergeant Finch and Dr. Servin. In sum, Rogers has not shown he was deprived of his right to effective assistance.

### III. CUMULATIVE ERROR

Rogers argues that the cumulative effect of repeated errors deprived him of a fair trial. We disagree.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. "The doctrine does not apply where the errors are few and have little or no effect on the trial's outcome." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010).

Although the prosecutor made an improper comment denigrating defense counsel and may have also improperly used impeachment testimony as substantive testimony and said that jurors would have to believe a police officer and doctor lied in order to acquit, we do not doubt that Rogers received a fair trial. As we note above, the unpreserved errors were curable with instructions and the preserved error was not prejudicial. We do not see any likelihood that improper argument affected the verdict. Therefore, Rogers is not entitled to a new trial under the cumulative error doctrine.

## IV. VICTIM PENALTY ASSESSMENT

Finally, Rogers argues that if we do not grant other relief, we should remand for the $500 crime victim penalty assessment to be stricken due to his indigency at the time of sentencing. Under RCW 7.68.035(4)(b), trial courts may no longer impose the crime victim penalty assessment on indigent defendants. "The new statute applies in all cases that were not yet final when the statute was adopted." *State v. Lee*, 32 Wn. App. 2d 137, 159-60, 553 P.3d 740 (2024); *see* LAWS OF 2023, ch. 449, § 1(4). The State concedes that Rogers is indigent and is entitled to remand for this limited purpose. We accept the State's concession and remand for the crime victim penalty assessment to be stricken from Rogers' judgment and sentence.

### CONCLUSION

We affirm Rogers' convictions. We remand for the trial court to strike the $500 victim penalty assessment from his judgment and sentence.

No. 58429-8-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

LEE, P.J.

PRICE, J.